**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | |
|---|---|
| **Audrey Jones**, **Nicholas Jones**, **Greg Schrock**, and **Marianelly Schrock**, <br><br>      *Plaintiffs,* <br><br>    v. <br><br> **Kiame Mahaniah**, in his personal capacity and in his official capacity as Secretary of the Massachusetts Department of Health and Human Services; **Staverne Miller**, in her personal capacity and in her official capacity as Commissioner of the Massachusetts Department of Children and Families; **Lori-Ann Dibella**, in her personal capacity and in her official capacity as Manager of the Northern Regional Licensing Unit of the Massachusetts Department of Children and Families; and **Sarah Petty**, in her personal capacity and in her official capacity as Supervisor of the Northern Regional Licensing Unit of the Massachusetts Department of Children and Families; <br><br>      *Defendants.* | Case No. 4:25-cv-12449 |

**VERIFIED AMENDED COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

### Introduction

1. In the midst of a foster-care crisis, the Massachusetts Department of Children and Families ("DCF") began revoking the licenses of Christian foster parents based on their religious beliefs. Even though DCF is desperately short on foster families, it required every family to promise that they would use a child's chosen

pronouns, encourage a child to transition socially and medically, and otherwise affirm a child's stated gender identity when it conflicted with the child's sex. If a family did not walk in lockstep with DCF's radical demands, DCF revoked their license—even if the family cared only for infants or close family members or a child for a few hours during respite care. And in Massachusetts, automatic affirmation was the only acceptable route—no matter that transgender identities in children are highly unstable, that most children will naturally learn to accept and identify with their natural bodies, or that social and medical "transitioning" have no proven benefits for a child's mental or physical health.

2.      The Plaintiff families here, the Joneses and the Schrocks, are licensed foster-care families in the State of Massachusetts. These families host young children and have successfully provided homes to 35 foster children in Massachusetts. Both families have been in good standing during their time as foster parents and provided supportive and loving homes to the children in their care.

3.      Both families will provide a loving and respectful home for any child, including transgender, gay, or lesbian foster children. But that was insufficient for Massachusetts. The State threatened to revoke the Joneses' license and the Schrocks lost their foster-care license because they could not sign a document promising to automatically "promote," "support" and "affirm" a hypothetical child's gender identity or gender expression against their religious convictions, all of which Massachusetts required under the rubric of "affirmation." ("LGBTQ+ Requirements").

4.      DCF's LGBTQ+ Requirements infringed and continues to infringe on Plaintiffs' constitutional rights in several ways. First, the State required the Joneses and the Schrocks to promise to use a child's chosen pronouns, verbally affirm a child's gender identity contrary to biological sex, and even encourage a child to medically transition, forcing these families to speak against their core religious beliefs.

5.      Second, DCF infringed on Plaintiffs' free-exercise rights through a policy that was not neutral or generally applicable. Licensing involves a system of individualized assessments. For example, DCF emphasizes matching to pair children with families best suited for them and grants discretionary exemptions to ensure that children are placed in the right home, like permitting parents to decline to host children based on age, sex, medical needs, behavioral needs, history of abuse, and disability, or just because it's not a good fit. But DCF provided no flexibility when it came to automatically affirming a child's stated gender identity and sexuality. A foster parent had to promise in advance to use a child's chosen pronouns and encourage a hypothetical child's gender transition, even if they never had and never would host a child who struggles to accept their natural body.

6.      Further, DCF regulations do not require parents to "affirm" a child's gender identity. Yet DCF required parents to sign a form promising to do so anyway. This ensured that parents willing to love and support any child were disqualified just because they could not "affirm" behaviors and beliefs that contradicted their faith. Nor did the regulations set out what was required to "support and affirm" children's gender identity and sexuality; rather, DCF and its employees chose to interpret the relevant regulation in a way that specifically disqualified many Christian and other religious foster parents.

7.      In response to this lawsuit, and after Plaintiffs filed for a preliminary injunction, DCF backtracked and amended its regulations. Now, DCF requires applicants to agree to promote and support a child's "individual identity and needs" rather than the child's "sexual orientation or gender identity." In its emergency rulemaking, DCF cited a letter it had received from the federal Administration of Children and Families (ACF) warning that DCF's LGBTQ+ Requirements were unconstitutional and violated federal funding guidelines. So DCF purports to have amended its policy "to preempt any potential escalation by ACF."

3

8.    The Joneses and the Schrocks recently renewed their licenses. But they remain fearful that DCF will continue to discriminate against them because of their religious beliefs. Wordplay aside, DCF's new rule is substantively the same policy it was before. DCF merely replaced its previous exclusionary text with vague words that don't appear to change anything. In fact, the Schrocks could not sign the new foster-parent agreement form until they received verbal assurances that they need not violate their beliefs to qualify for a license. After all, nothing prevents DCF from regarding pronoun use or similar speech as part and parcel of supporting a child's "individual identity and needs" the same way it took that position under the old language.

9.    Indeed, no regulation or policy prevents DCF from going back to its old ways. Just the opposite: DCF continues to defend its previous exclusionary policy in a different lawsuit before this same court involving another Christian family that never received their license. That continued defense reveals that DCF changed its policy as a litigation tactic to try to moot this case, not because it believes the old policy was wrong. DCF has not abandoned the old policy; it merely set it aside for now.

10.    And the new policy is just as bad for the Commonwealth's foster children as the old one—to the point of cruelty. Massachusetts is in desperate need of foster families. Foster children are sleeping in state offices because there's no family to take them. Children are shuffled between short-term homes and subjected to maltreatment, harming their future chances of achieving stability and permanence. And DCF is even willing to remove young infants and toddlers with no understanding of "gender identity" from loving homes because of their Christian beliefs, creating more trauma for the most vulnerable members of society. Rather than broaden the tent and find loving homes for children—which is supposed to be DCF's reason for existence—DCF has chosen to revoke licenses from families who refuse to think as DCF demands. DCF's actions offend the Constitution and common decency.

## Jurisdiction and Venue

11.    This action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

12.    This Court has original jurisdiction under 28 U.S.C. § 1331 and § 1343.

13.    This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

14.    Venue is proper in this district under 28 U.S.C. §§ 1391(b)(1) and (2) because a substantial part of the events and omissions giving rise to the claims occurred in the District of Massachusetts; the effects of the challenged statute are felt in this District; and the Defendants can and do perform official duties in this District.

## Plaintiffs and Defendants

15.    Plaintiff Audrey Jones is a resident of Worcester County, Massachusetts. She was a licensed foster parent in the Commonwealth from 2023 to 2025.

16.    Plaintiff Nicholas "Nick" Jones is a resident of Worcester County, Massachusetts. He was a licensed foster parent in the Commonwealth from 2023 to 2025.

17.    Plaintiff Greg Schrock is a resident of Middlesex County, Massachusetts. He was a licensed foster parent in the Commonwealth from 2019 to 2025.

18.    Plaintiff Marianelly Schrock is a resident of Middlesex County, Massachusetts. She was a licensed foster parent in the Commonwealth from 2019 to 2025.

19.    Defendant Dr. Kiame Mahaniah is the Secretary of the Massachusetts Executive Office of Health and Human Services. Dr. Mahaniah is responsible for the policies and decisions of DCF pursuant to Mass. Gen. Laws Ann. ch. 6A, § 16. His office is located in Boston, Massachusetts.

20.     Defendant Staverne Miller is the Commissioner of DCF. She is responsible for the regulations and policies of DCF pursuant to Mass. Gen. Laws Ann. ch. 18B, §§ 6–7.

21.     Defendant Lori-Ann DiBella is the manager of the Northern Regional Licensing Unit of DCF. She was ultimately responsible for the decision to discontinue the Schrocks' foster-care license.

22.     Defendant Sarah Petty is a supervisor in the Northern Regional Licensing Unit of DCF. She reviewed and approved the recommendation to discontinue the Schrocks' foster-care license.

23.     All Defendants are sued in their personal and official capacities.

### Factual Allegations

**Massachusetts' Foster Care Crisis**

24.     DCF's decision to pull licenses from Christian families came in the midst of a foster-care crisis in Massachusetts. The Commonwealth has more children than it can provide homes, a disproportionate number of allegations of mistreatment, and no actionable solutions.

25.     More than 6,500 children are in the Massachusetts foster-care system, but the State only has 5,100 licensed foster homes. 1,482 of the children in the State's care—more than 20% of the total—are not placed or residing with a family.[1]

26.     The lack of homes for foster children was labeled a "crisis" beginning in 2019 when an investigation by the *Boston Globe* revealed that some Massachusetts foster children were left with nowhere to live, even sometimes spending the night in their social worker's car.[2]

---

[1] *Mass. Dep't of Child. & Fams. Q. Profile – FY'2025, Q3 (01/01/25 – 03/31/25)* (2025), perma.cc/9YY3-LMNU.

[2] Kay Lazar, *In a broken foster system, some kids can't find a bed for the night*, Bos. Globe (April 6, 2019), www.bostonglobe.com/metro/2019/04/06/state-broken-foster-

27.     That same investigation revealed that Massachusetts had one of the worst records in the country for providing stable foster-care homes. In 2018, the State moved one-third of all foster children at least three times during their first year in the foster-care system. *Id.*

28.     The crisis has continued largely unabated. In 2023, an investigation by a Boston NBC affiliate showed that the State was renting out rooms for "child-sitting" because it didn't have enough beds for all of the children in its care.[3]

29.     One social worker described the situation to NBC as a "placement crisis." *Id.*

30.     Nor have placements improved. A 2023 examination found that 47% of Massachusetts foster children are moved at least three times per year. That makes the State the third-worst in the nation for stable foster-care homes.[4]

31.     The homes that are available are often unsafe for children. DCF's own reporting shows that maltreatment of foster children is high and increasing. In 2023, between 214 and 621 children experienced maltreatment in DCF care.[5] This is a historical problem in the State, which was second in the nation for recurrence of abuse

---

system-some-kids-can-find-bed-for-night/40xAjxIIT0errJZVjSiY5H/story.html?p1=Article_Inline_Text_Link.

[3] *Social worker describes 'placement crisis' for kids in care of Mass. DCF*, NBC 10 Boston (Sept. 12, 2023), www.nbcboston.com/investigations/social-worker-describes-placement-crisis-for-kids-in-care-of-mass-dcf/3134362/.

[4] *Massachusetts Foster Care Survey, Survey Results*, HopeWell (last visited Aug. 27, 2025), hopewellinc.org/whats-happening/massachusetts-foster-care-survey/#results.

[5] The Editorial Board, *The whole point of foster care is to keep kids safe. So DCF maltreatment reports should set off alarms,* Bos. Globe (December 15, 2024), www.bostonglobe.com/2024/12/15/opinion/foster-care-dcf-maltreatment-reports/.

and neglect for foster children in 2022 (the latest year for which data was available).[6]

32.    Facing this crisis, DCF decided to substantially narrow the pool of eligible foster parents by excluding everyone who will not promise to support and affirm a child's sexual orientation and gender identity.

33.    Not only is this requirement discriminatory, it will dramatically reduce the number of foster homes in the Commonwealth.

34.    Scholarly examination of this topic suggests that this will exclude between one-half and two-thirds of all eligible foster parents. *See* David M. Smolin, *Kids Are Not Cakes: A Children's Rights Perspective on* Fulton v. City of Philadelphia, 52 Cumb. L. Rev. 79, 143 (2022).

**Foster-Care Licensure in Massachusetts**

35.    Becoming a licensed foster family in Massachusetts is a multi-stage process. DCF's policies for this process are contained in a document entitled "Licensing of Foster, Pre-Adoptive, and Kinship Families," which is attached as Exhibit 1 to this Complaint.

36.    DCF's policy states that it "does not deny any adult the opportunity to become a foster family on the basis of race, color, age, biological sex, ethnicity, marital status, sexual orientation, gender identity or expression, religion, creed, ancestry, national origin, language, disability or veteran's status." Ex. 1 at 13.

37.    To become a licensed foster family, a family must first participate in an information session and submit an application. Ex. 1 at 13–14.

38.    After a family submits an application, DCF performs background checks on the members of the household over the age of 15, and a recruiter performs a home

---

[6] *Child Welfare Outcomes Report Data,* Children's Bureau, Admin. of Child. and Fams., U.S. Dep't of Health and Hum. Servs. (2022), cwoutcomes.acf.hhs.gov/cwo-datasite/recurrence/index/.

visit. *See* Ex. 1 at 14. At the home visit, the recruiter provides information about the licensing process.

39.    If the family's "home meets the basic housing requirements; all household members lack a disqualifying criminal or child welfare history; and the Recruiter and their supervisor recommend that the family proceed," the family moves to the "Caregiver Training and Assessment" stage. Ex. 1 at 16.

40.    During the Caregiver Training and Assessment stage, the family is required to undergo certain training sessions while DCF attempts to "evaluate the prospective family's caregiving capacity." Ex. 1 at 18.

41.    The Caregiver Assessment is a detailed investigation of the applicant family. A social worker visits the family at least three times, including at least two home visits. Ex. 1 at 19. The social worker also interviews each parent separately at least once and together at least once. During the interview, the social worker asks about the parents' "history, trauma history, cultural beliefs, and motivation and how these impact parenting style and skills; expectations of and understanding of a foster family's role and responsibilities; mental health history, substance/alcohol use, and relationship history and how each could affect their caregiving ability; parenting experience and attitude towards parenting; understanding of and use of the protective factors to strengthen families; and understanding of the concepts they are learning about in training." *Id.* In practice, the social worker will also provide the family with written questions regarding these topics, which the family answers in writing.

42.    DCF must perform this assessment in accordance with Massachusetts regulation 110 C.M.R. 7.104, which establishes the State's "Standards for Licensure as a Foster/Pre-adoptive Parent."

43.    110 C.M.R. 7.104 contains requirements for foster families and their homes. The regulation states that an applicant parent must demonstrate the ability to accomplish 17 different goals "to the satisfaction of the Department." 110 C.M.R.

7.104(1). These requirements are subjective. They include things like the ability "to deal with difficult issues in the child's background" and the ability "to respect and make efforts to support the integrity of a child's racial, ethnic, linguistic, cultural and religious background."

44.    Included in this list, prior to the December 12, 2025 amendments, was the ability "to promote the physical, mental, and emotional well-being of a child placed in his or her care, including supporting and respecting a child's sexual orientation or gender identity." 110 C.M.R. 7.104(1)(d) (superseded Dec. 12, 2025).

45.    110 C.M.R. 7.104 contains a long list of other requirements as well, including having a home that meets 18 separate standards contained in 110 C.M.R. 7.105.

46.    Some of the requirements for foster families in 110 C.M.R. 7.104 and 7.105 are waivable. DCF may waive the requirements of 1) U.S. citizen status, 110 C.M.R. 7.104(6); 2) the requirement that a child's bedroom be at least 50 square feet, 110 C.M.R. 7.105(7); and 3) the limits on the number of children in one home, 110 C.M.R. 7.105(12)(b).

47.    After performing the home visits and other investigative steps, the social worker puts together a caregiver assessment, which includes the family's application, the results of any background checks, a summary of the worker's interviews, an assessment of the family's caregiving capacity, and a licensing recommendation.

48.    This caregiver assessment is then reviewed by a license review team, which decides whether to grant the family a license.

49.    After a family is granted a foster-care license, DCF's licensing agents perform annual assessments of their license. See Ex. 1 at 28; 110 C.M.R. 7.113. But in practice, this often does not occur in a timely manner.

50.    During an annual assessment, a licensing agent performs a home visit to discuss "any significant events or changes in the last year, including how they impacted caregiving ability, if applicable; experiences living with foster/pre-adoptive

10

child(ren) in the past year; identified strengths and challenges; what trainings, services, and supports were helpful in the past year; and what trainings, services, and supports the foster family needs to feel successful in the upcoming year." Ex. 1 at 29.

51.    The licensing agent then writes an "annual update to the Caregiver Assessment." Ex 1 at 29. This update "evaluates the foster parents' ongoing ability to fulfill the requirements of a foster parent and meet the needs of foster children through their knowledge of and use of the protective factors." *Id.*

52.    The licensing agent then meets with their supervisor and "[t]ogether, they recommend whether or not to continue licensing." Ex. 1 at 30. The Area Program Manager then makes a final decision. *Id.*

53.    DCF's licensure policies and procedures described above involve extensive individualized assessment of foster families at the initial licensure and annual review stages. DCF can exercise its discretion in licensing a family and in deciding whether to renew a license each year.

54.    Social workers, licensing agents, and DCF are given discretion to apply and interpret the relevant standards to each individual family based on their own judgment and understanding of DCF policy.

55.    For example, each of the criteria for licensure eligibility in 110 C.M.R. 7.104(1) must be met "to the satisfaction of the Department." The regulation does not give any objective standards. Additionally, each of the criteria is subjective. None provides objective standards or measurements by which to judge a particular applicant or foster family.

**Placement of Children with Foster Families**

56.    Both parents and DCF exercise discretion to achieve a good fit in placements.

57.    For example, after a family is licensed and thus becomes eligible for placement, a family always has the right to say no. Placements are always optional, and

11

DCF must "provide the prospective foster/pre-adoptive parent with sufficient information about the child to enable the foster/pre-adoptive parent to determine whether to accept placement of the child." 110 C.M.R. 7.112(1).

58.    Families may also give DCF parameters for which placements they are able or willing to accept. DCF policy notes that "Placement recommendations take into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster and the capacities of the foster parent." Ex. 1 at 45. Families frequently indicate limitations related to age, sex, disability, medical needs, history of abuse, or behavioral issues. And DCF does not disqualify or penalize families for stating that they will not accept children over a certain age, of a certain sex, or with certain behavioral issues.

59.    The information DCF is required to provide includes "the service plan for the child, behavior management guidelines and techniques, the child's medical needs, the child's educational needs, current health and education information and/or records available, legal status and any other special conditions or requirements." 110 C.M.R. 7.112(1).

60.    DCF also exercises discretion to promote children's best interests. Massachusetts law instructs DCF to make all out-of-home placements "in the best interests of the child, based upon safety, well-being and permanency of the child and the child's individual needs." 110 C.M.R. 7.101(1).

61.    DCF can even place children in homes that are not licensed, such as placing children in fictive kinship homes, even though the home is not a blood relative.

**DCF's LGBTQ+ Requirements**

62.    The prior version of 110 C.M.R. 7.104(1)(d) required that foster families "demonstrate … the ability to … support[ ] and respect[ ] a child's sexual orientation or gender identity."

63.    From 2009 to 2023, DCF did not interpret this language to require foster families to make promises that they would verbally promote the Department's views on issues of gender or sexuality.

64.    That changed sometime around 2023 to 2024, when DCF began requiring foster families to sign a "Foster Parent Agreement" attached as Exhibit 2 to this Complaint, in which the family agrees that it will speak and act in certain ways.

65.    By signing the Foster Parent Agreement, a foster family promised to "[s]upport, respect, *and affirm* the foster child's sexual orientation, gender identity, and gender expression." Ex. 2 at 3 (emphasis added).

66.    DCF also promulgated another document, its "LGBTQIA+ Nondiscrimination Policy," that specified what the Department meant by "support, respect, and affirm" and is attached as Exhibit 3 to this Complaint.

67.    While the LGBTQIA+ Nondiscrimination Policy's plain terms dictated how DCF would treat a foster child, DCF informed foster families that the policy also set the standard for what it meant for a foster family to "support, respect, and affirm" a child's sexual orientation, gender identity, and gender expression. By signing the Foster Parent Agreement, a foster family agreed to comply with the LGBTQIA+ Nondiscrimination Policy's terms.

68.    The LGBTQIA+ Nondiscrimination Policy required certain types of speech and actions. Among other things, a foster family had to: "accept[ ] a child's assertion of their LGBTQIA+ identity and allow[ ] children to use their expressed names and pronouns at any time," "address[ ] children by their names and pronouns," "support[ ] gender-neutral practices regarding clothes and physical appearance" including "gender-affirming clothing, such as binders, packers, body shapers, bras, breast inserts, and similar items in a timely manner," and provide children with culturally responsive and affirming…medical care, mental health care, and community resources, including gender-affirming care when applicable." Ex. 3 at 3–4.

69.    Further, the policy prohibited foster parents from engaging in certain speech and actions. It prohibited "attempts to convince LGBTQIA+ children/youth to reject or modify their sexual orientation, gender identity, or gender expression," or to "impose…personal, cultural, and/or religious beliefs on children and families involved with the Department." Ex. 3 at 4.

70.    Consistent with the LGBTQ+ Requirements, DCF required parents to "promote," "support," and "affirm" a child's gender identity and expression in all of these areas. In other words, Plaintiffs had to agree to encourage and affirm a child's desire to go by chosen pronouns and a chosen name, and to engage in a medical "transition." And Plaintiffs were prohibited from sharing their contrary religious beliefs that God created us male and female, that a person's gender and sex are objectively rather than subjectively determined, and that the body itself witnesses to God's perfect design. *E.g.*, *infra* ¶¶ 78–82.

71.    If a family declined to sign this agreement, they could not receive a foster-care license. DCF would not waive or modify the provision related to sexual orientation, gender identity, and gender expression in any way. Nor would DCF address the issue on a case-by-case basis by seeking to match children with families according to their needs and particular circumstances.

72.    DCF's policy had no religious exemption. If a family's religion did not permit them to use opposite-sex pronouns or encourage a child to socially and medically transition, they had to choose between their religion and a foster-care license.

73.    Previously licensed families who could not sign the Foster Parent Agreement have had their licenses revoked or discontinued.

**Nick and Audrey Jones**

74.    Nick and Audrey Jones are a Christian couple living in Worcester County, Massachusetts. They have been a licensed foster family since 2023 and currently provide foster care to children under the age of six.

14

75.   At the time of filing this lawsuit, the Joneses had one foster placement: a then 17-month-old girl who had lived with the Joneses for nearly her entire life. In total, the Joneses have provided foster care for eight different children. They also have two biological children.

76.   Because of Nick and Audrey's Christian faith, they were told that DCF intended to discontinue or revoke their foster-care license and remove their foster child from their home.

77.   Nick and Audrey are Christians who attend a home church every week on Sunday and read the Bible with their children. They take seriously the implications of their faith in their day-to-day lives.

78.   Nick and Audrey believe that the Bible teaches that people are created as male and female and cannot change that fact. They believe that using opposite-sex pronouns or making efforts to change one's gender is wrong. This is a strongly held religious conviction for the Joneses and millions of other Christians, Jews, and Muslims throughout the country.

79.   The Joneses believe that the bodies of men and women represent God's creational design. One's perception of one's body is not the determining factor in elucidating personal identity. The body itself witnesses to God's design and intent for living life for his glory as a man or a woman. In this way, what is natural reflects what is spiritual. In their biblical worldview, the Joneses teach children about the goodness of their God-given body.

80.   The Joneses believe that Scripture will not allow any such changing of the body from male to female or vice versa. The body is not an impediment to one's true self or a blank canvas for a person to mold to their own image; rather, the body is the gift of God and a temple for the Holy Spirit. The testimony of Genesis signals God's direct action in forming men and women: "Male and female he made them," a declaration honored by Jesus in his day (Genesis 1:27; Matthew 19:4). According to

their beliefs, the body is not distinct from one's personal identity; the body *constitutes* one's divinely mandated identity.

81.    The Joneses believe that it is not "caring" to encourage children to change their bodies to fit a perceived "gender identity." Such action goes against the fixed nature of the body and also reflects an unwise rejection of the commonly known principle that children need time to understand their personal identity. The Joneses believe that true care of children helps children to embrace the goodness of God's design of their body, not countermand it.

82.    The Joneses believe that biblical and compassionate care honors this scriptural principle. They believe all people deserve this care as all are affected by sin. Such care is thus not unloving; it is deeply loving and consonant with the character of the Savior who called the little children to himself, affirming their God-given dignity in a historical context that often failed to do so (Matthew 18:1–6).

83.    They believe that the Bible teaches that marriage is a covenant between one man and one woman. Similarly, they believe that sex is only proper between a married man and woman.

84.    Nick and Audrey believe they could provide a loving home for any child, including children identifying with a gender other than that of their biological sex, or a child who identifies as gay or lesbian. In the event of a conflict related to gender identity related issues, the Joneses would always seek to prioritize the child's best interests while still staying true to their beliefs.

85.    There were certain DCF requirements with which they categorically could not comply with because of their religious beliefs, including using a child's chosen pronouns that conflict with the child's biological sex, verbally affirming a child's desire to identify as the opposite sex (or no sex), or encouraging a child to undergo a social or medical gender "transition."

16

86.     Then there were other hypothetical requirements or conflicts which they would approach on a case-by-case basis, taking into account the child's age, maturity, and the nature of their relationship with the child. For example, if a child wanted to attend an event with which they disagreed, they would listen respectfully, evaluate whether this is an event the child could attend on their own or whether the child would require a parent to chaperone them, and seek to find a workaround to any conflicts of conscience. They would take this approach for any of their children to always ensure that their children are first and foremost safe. Throughout any conflict, they would always assure the child that they unconditionally loved him or her no matter how the child identifies and no matter what disagreements they may have.

87.     In 2025, the Joneses received the new Foster Parent Agreement for the first time as part of their annual license review.

88.     During the home visit portion of the annual review, the DCF licensing agent asked Audrey about the Joneses' views on LGBTQ issues and, specifically, whether the Joneses could support and affirm a child's gender identity and sexual orientation. Audrey informed the agent that she believes the Joneses could provide a loving and safe home for any child, but described the views recited in paragraphs 78–84.

89.     Later, the licensing agency relayed a copy of the Foster Parent Agreement over email, along with a series of questions about the Joneses' views on LGBTQ issues.

90.     Audrey informed the agent that, based on the Joneses' religious views, they could not sign the Foster Parent Agreement. They cannot support a child dating someone of the same sex or affirm a child who wanted to use different pronouns.

91.     In response, the Joneses' licensing agent stated that continuing their license "won't work." DCF relayed that there were no exemptions from signing the Foster Parent Agreement form.

92. The Joneses' license was up for renewal in July 2025 and technically expired, but they never received an official revocation or discontinuation letter from DCF.

93. They were told that DCF intended to remove their foster daughter—a 17-month-old infant who was totally unaffected by DCF's LGBTQ+ Requirements—from their home *only* because they are Christians and could not agree to sign the Foster Parent Agreement form that required them to violate their faith.

94. After the filing of this lawsuit, DCF began to focus on reunifying the Joneses' foster daughter with her father, even though it had never previously articulated a plan or concrete timeline for doing so.

95. Then, in November 2025, DCF stated that it would not remove the Joneses' foster daughter until reunification.

96. The Joneses' foster daughter was reunified with her father on January 30, 2026.

**Greg and Marianelly Schrock**

97. Greg and Marianelly Schrock are a Christian couple living in Middlesex County, Massachusetts. They have two biological children and were a licensed foster family from 2019 to 2025. They cared for 28 separate foster children over those six years. They were, and are, an excellent foster family who have provided a loving and supportive home to children throughout their entire time as foster parents.

98. In June 2025, Massachusetts discontinued the Schrocks' foster-care license because of their Christian beliefs about sexual orientation and gender identity.

99. Greg and Marianelly are devoted Christians who attend a non-denominational church every Sunday, read the Bible, and take the teachings of their faith seriously.

100. In fact, the Schrocks became foster parents because of their faith. They understand the teachings of the Bible to require that Christians take special care of widows and orphans, *see* James 1:27, and they believe that foster care is a way they

18

can live out their faith. Greg and Marianelly were faithful and active foster parents for six years in large part because of their faith.

101.   The Schrocks believe that the Bible teaches that human beings are created as male or female and that an individual cannot change the fact of their God-gifted sex.

102.   They believe that the bodies of men and women represent God's creational design. One's perception of one's body is not the determining factor in elucidating personal identity. The body itself witnesses to God's design and intent for living life for his glory as a man or a woman. In this way, what is natural reflects what is spiritual. In their biblical worldview, the Schrocks teach children about the goodness of their God-given body.

103.   The Schrocks believe that Scripture does not permit efforts to change the body from male to female or vice versa. The body is not an impediment to one's true self; the body is the gift of God. The testimony of Genesis signals God's direct action in forming men and women: "male and female He created them," a declaration honored by Jesus in his day (Genesis 1:27; Matthew 19:4–5). According to their beliefs, the body is not distinct from one's personal identity; the body *constitutes* one's divinely mandated identity.

104.   The Schrocks believe that it is not "caring" to encourage children to change their bodies to fit a perceived "gender identity." Such action goes against the fixed nature of the body and also reflects an unwise rejection of the commonly known principle that children need time to understand their personal identity. The Schrocks believe that true care of children helps children to embrace the goodness of God's design of their body, not countermand it.

105.   The Schrocks believe that biblical and compassionate care honors this scriptural principle. They believe all people deserve this care as all are affected by sin. Such care is thus not unloving; it is deeply loving and consonant with the character

19

of the Savior who called the little children to himself, affirming their God-given dignity in a historical context that often failed to do so (Matthew 18:1-6).

106.    They believe that using opposite-sex pronouns or making efforts to change one's gender is false, wrong, and violates biblical principles.

107.    The Schrocks also believe that the Bible teaches that marriage is a covenant between one man and one woman. Similarly, they believe that sex is only proper between a married man and woman.

108.    These beliefs do not affect Greg and Marianelly's ability to provide a loving home for all children. They believe, and their extensive experience as foster parents shows, that they could provide a loving home for any child, including children who identify as a gender different than their biological sex, or as gay or lesbian.

109.    Despite this, DCF discontinued the Schrocks' foster-care license in 2025 because of their religious beliefs.

110.    For Greg and Marianelly, the Department's anti-religious bigotry began when they were first licensed in 2019. During a training module on LGBTQ issues, Marianelly asked how the training translated to their obligations as foster parents when they were signing up to foster toddlers and babies. Because they asked a question about LGBTQ issues, the Schrocks were singled out for a special meeting with DCF staff.

111.    In that meeting, DCF singled out the Schrocks' religious beliefs. DCF staff asked if the Schrocks would read their foster children the portions of the Bible that say homosexuality is a sin. The Schrocks answered honestly regarding their beliefs on sexuality and reading the Bible. The licensing process continued, but the Schrocks were told that it would be cause for concern if they tried to "pray the gay away."

112.    This pattern continued into 2025. In December 2024, the Schrocks received notice that their annual reassessment was beginning. In the home visit portion of

the assessment, the licensing agent mentioned the 2019 meeting about the Schrocks' religious beliefs. She then asked if having an LGBTQ child placed in the home would be a problem for the family. The Schrocks informed her that it would not.

113.    Later, the licensing agent sent the Schrocks an email stating she needed to schedule a visit to sign the new Foster Parent Agreement. The Schrocks asked for an advance copy of the Foster Parent Agreement form, but didn't receive one until a week later after asking a second time.

114.    A week after the Schrocks received the Foster Parent Agreement, they learned from their resource worker that, internally, DCF officials believed that they (the Schrocks) would not sign the Foster Parent Agreement and that it would be necessary to close their home. This revelation came *before* the Schrocks explained their religious objections to the problematic clause on sexual orientation and gender identity.

115.    Within a few days, Marianelly sent DCF an email explaining that: "Our hope is that we can continue to serve displaced children as we have for the last six years. To this end, we request that an exemption be allowed for our religious convictions on this point. Our convictions remain as they have been throughout our time as foster parents, during which we have taken long-term placements and numerous respite placements. As with each of those cases, we willingly defer to DCF as to whether our home is best equipped to care for the unique situation of each child. We love all children. We support and respect all children. However, we cannot in good conscience overlook the implications of this affirmation clause."

116.    After the Schrocks sent this email, they met with DCF on March 27, 2025. In this meeting, which included Sarah Petty, the Schrocks informed DCF that their religious beliefs did not allow them to use opposite-sex pronouns or affirm a child's gender identity if it did not align with their biological sex. In response, Petty told

the Schrocks that the Foster Parent Agreement wasn't just about ensuring that children were affirmed, but that it was also about being respectful to other family members, uncles, aunts, and that this is what was expected of them in society in general. In that meeting, DCF told the Schrocks that there was no possibility of exemption, and they must sign the agreement or lose their foster-care license.

117. After the meeting, the Schrocks attempted one last time to preserve their license. In an email to DCF, they said: "To summarize our viewpoint: We are happy to sign the DCF Foster Parent Agreement, except for the contents of line 6, which requires us to approve, facilitate, and agree with practices that contradict our religious beliefs. We agree with the fundamental dignity of every human and the respect that must accompany that…could you please confirm that an exemption for line 6 is off the table?"

118. On June 2, 2025, DCF discontinued the Schrocks' foster-care license, and Sarah Petty authored the revocation letters. And Defendant Lori-Ann Dibella, as the regional program manager, would have personally reviewed and approved of DCF's decision to discontinue the Schrocks's license. *See* Ex. 1 at 4.

119. Further, Defendants Mahaniah and Miller were at all times responsible for implementing and overseeing enforcement of DCF's LGBTQ+ Requirements, and they did so despite being aware that it burdened First Amendment rights as this Court recognized in *Burke v. Walsh*.

**DCF Amends its LGBTQ+ Requirements**

120. On September 3, 2025, the Joneses and the Schrocks filed this lawsuit.

121. Shortly thereafter, Acting Assistant Secretary of the federal Administration for Children and Families (ACF) Andrew Gradison sent DCF a letter stating DCF's policy is "contrary to the purpose of child welfare programs" and unconstitutional. That letter is attached as Exhibit 4 to this Complaint.

122.    The letter also reminded DCF that ACF has "the responsibility of monitoring how federal funds are used and ensuring that federal law is upheld," and announced that ACF would investigate DCF's policy. Ex. 4.

123.    In November, the Joneses and the Schrocks filed a motion to preliminarily enjoin DCF's LGBTQ+ Requirements as applied to them.

124.    Just days before Defendants' response to the motion for preliminary injunction was due, DCF amended its licensing regulations on an emergency basis.

125.    According to the regulation filing, attached as Exhibit 5 to this Complaint, DCF amended the prior version of 110 C.M.R. 7.104(1)(d) "to preempt any potential escalation by ACF." Ex. 5 at 3.

126.    That amendment removed the requirement that foster parent applicants support and respect "a child's sexual orientation or gender identity." This language was replaced with a similar obligation to support and respect "a child's individual identity and needs." 110 C.M.R. 7.104(1)(d).

127.    DCF similarly amended the Foster Parent Agreement Form. The amended Foster Parent Agreement Form is attached as Exhibit 6 to this Complaint.

128.    The amendment removed the requirement that foster parent applicants "[s]upport, respect, and affirm the foster child's sexual orientation, gender identity, and gender expression." Ex. 2 at 3. In its place, two requirements were added: First, applicants must agree to "[r]espect the rights of foster children under Department policy and state law." Ex. 6 at 3. Second, applicants must agree to "assist the foster child in maximizing their potential, including supporting a child's individual identity and needs." *Id.*

129.    Amendments were also made to DCF's LGBTQIA+ Nondiscrimination Policy, attached as Exhibit 7 to this Complaint. Generally, these amendments replace requirements that foster parents affirm children's LGBTQIA+ identification with requirements that foster parents support children's identities. *Compare, e.g.*, Ex. 3 at

23

3 *with* Ex. 7 at 3. Still, the LGBTQIA+ Nondiscrimination Policy says that DCF "addresses children by their names and pronouns," Ex. 7 at 3; "supports gender-neutral practices regarding clothing and physical appearance," *id.* at 4; and "ensures that LGBTQIA+ children/youth are provided with culturally responsive and affirming case management, medical care, mental health care, and community resources," *id.* Indeed, "[a]ll individuals who interact with children and families must be respectful of how individuals ask to be identified." *Id.* at 2.

130.   DCF represented that, because of the foregoing amendments, the Joneses and the Schrocks are no longer precluded from being licensed due to their religious beliefs. In light of these representations and the policy changes, the Joneses and the Schrocks withdrew their motion for preliminary injunction and sought to renew their licenses. Both the Joneses and the Schrocks were eventually relicensed.

**DCF's Steadfast Defense of its LGBTQ+ Requirements**

131.   The Joneses and the Schrocks reasonably fear that DCF may still punish them because of their religious beliefs.

132.   *First*, Defendants have enforced or threatened to enforce DCF's LGBTQ+ Requirements to exclude religious families like the Joneses and the Schrocks, even though they knew that doing so burdened First Amendment rights.

133.   Indeed, a Christian couple previously sued DCF, including Defendant Mahaniah, for similarly discriminating against Christian families because of their sincerely held religious beliefs about human sexuality. *Burke v. Walsh*, 3:23-cv-11798, 2024 WL 3548759, at \*7 (D. Mass. June 5, 2024). This Court held "it was clearly established, *in 2023*, that DCF's individualized and discretionary assessment of…foster license application[s] was not a 'generally applicable' policy and thus was subject to strict scrutiny." *Id.* at \*7 (emphasis added). Yet Defendants enforced or threatened to enforce the same policies (now superseded) against the Joneses and the Schrocks *in 2025*.

134.    *Second*, DCF did not voluntarily end its previous unconstitutional policy to comply with the First Amendment. Rather, it made minor non-substantive amendments to its policies to try to moot this lawsuit and avoid threatened enforcement action by the federal administration. But nothing in the new regulation or elsewhere prevents DCF from returning to its old ways as soon as this lawsuit ends or when a new presidential administration takes office.

135.    *Third*, DCF's own actions confirm that the threat is real because DCF asserts that its previous exclusionary policy was and is constitutional. In *Burke v. Mahaniah*, No. 3:23-cv-11798, DCF argues that "no constitutional violation occurred" when it declined to license a Catholic couple because of their Christian beliefs much like it declined to renew the Schrock's license here. Defs.' Mem. Law Supp. Mot. Summ. J. at 9, *Burke*, No. 3:23-cv-11798 (Dkt. No. 169). In fact, DCF argues that "[g]ranting a license" to the Burkes under any circumstances "was not a viable option," and excluding the Burkes was the least restrictive means to achieve the government's compelling interest to protect children who identify as LGBT. *Id.* at 25. That position is flatly inconsistent with any claim that DCF's new policy moots this case. Rather, it confirms that the Joneses and the Schrocks reasonably fear that DCF will continue to discriminate against religious families. *See also* Defs.' Opp'n Pls.' Mot. Summ J. at 27–30, *Burke*, No. 3:23-cv-11798 (Dkt. No. 175) (making similar arguments that its previous policy was constitutional).

136.    *Fourth*, the new policy's vague language does not meaningfully change licensing requirements. DCF could easily interpret and enforce its current policy in exactly the same manner it interpreted its previous policy. For example, 110 C.M.R. 7.104(1)(d) requires that foster parents support and respect a child's "individual identity and needs," which *includes* a child's sexual orientation and gender

25

identity.[7] So the plain language of the rule still requires foster families to support and affirm a child's desire to identify as transgender. Further, the current LGBTQ+ Nondiscrimination Policy states that "[a]ll individuals who interact with children and families must be respectful of how individuals ask to be identified." So while DCF has chosen to license the Joneses and the Schrocks today, it may revoke their licenses tomorrow because they are unable to use a child's chosen name and pronouns.

137.    For all these reasons, the Joneses and Schrocks reasonably fear that DCF will continue to discriminate against religious families when the opportunity arises, *e.g.*, when these lawsuits end, or when a new presidential administration is elected.

**Claims for Relief**
<u>Claim I</u>
<u>First Amendment Free Speech</u>

138.    Plaintiffs incorporate by reference all preceding paragraphs.

139.    The First Amendment forbids any law "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I.

140.    Facially and as applied, former 110 C.M.R. 7.104(1)(d) (superseded Dec. 12, 2025) requires applicants to agree to speak certain words, like opposite-sex pronouns, and to engage in certain expressive activities, like affirming romantic relationships that express DCF's preferred views on human sexuality, as a condition for obtaining a foster-care license.

141.    Because DCF conditions foster-care licenses on an applicant's willingness to speak certain words and engage in certain expressive activities, former 110 C.M.R. 7.104(1)(d) compels speech.

---

[7] Indeed, the former version of 110 C.M.R. 7.104(1)(d) did not explicitly require foster parents to "affirm" a child's sexual orientation and gender identity. Rather, it required respecting and supporting a child's sexual orientation and gender identity. But DCF still required foster parents to sign a form agreeing to "affirm." And that form can easily be amended to reflect DCF's current interpretation of its policies.

142. Former 110 C.M.R. 7.104(1)(d) does not serve any valid or compelling interest in a narrowly tailored way, and there are many less restrictive alternatives to achieving the State's legitimate goals that do not infringe on free-speech and free-association rights.

143. In addition to compelling speech, DCF restricted Plaintiffs' speech based on their viewpoint.

144. Facially and as applied, former 110 C.M.R. 7.104(1)(d) forbids applicants from expressing certain views, like the Plaintiffs' religious views on human sexuality, and engaging in certain expressive activities, like reading scripture in their home, as a condition for obtaining a foster-care license.

145. Because DCF compels applicants to speak and express DCF's preferred views on human sexuality while also prohibiting applicants from expressing other views, DCF regulates speech based on content and viewpoint, it engages in unconstitutional viewpoint discrimination.

146. Foster families are permitted to speak on issues of gender identity and sexual orientation, but only if their speech espouses the viewpoint favored by DCF. If foster families speak on those issues in a way that does not "support and affirm" a child's gender identity, gender expression, or sexual orientation, the agency will revoke that family's foster-care license.

147. This is classic viewpoint discrimination in violation of the First Amendment's Free Speech Clause.

148. Each Defendant was personally involved in applying former 110 C.M.R. 7.104(1)(d) to the Joneses or the Schrocks, or had authority over and responsibility for applying the licensing rules, including 110 C.M.R. 7.104(1)(d) to the Joneses or the Schrocks.

27

149.   The Defendants also acted contrary to clearly established law when they threatened to revoke the Joneses' license and when they actually discontinued the Schrocks's license.

Claim II
First Amendment Free Speech—Overbreadth

150.   Plaintiffs incorporate by reference all preceding paragraphs.

151.   DCF's former LGBTQ+ Requirements punish a substantial amount of speech by Massachusetts foster families.

152.   Because the policy, among other things, compels speech and discriminates based on viewpoint, it is unconstitutional as applied to a substantial amount of the speech in its ambit.

153.   In contrast to their unconstitutional applications, the former LGBTQ+ Requirements have relatively few constitutional applications.

154.   The policy is therefore an unconstitutionally overbroad regulation of speech.

155.   Each Defendant was personally involved in applying former LGBTQ+ Requirements to the Joneses or the Schrocks, or had authority over and responsibility for applying the licensing rules, including the former LGBTQ+ Requirements, to the Joneses or the Schrocks.

156.   Defendants acted contrary to clearly established law when they threatened to revoke the Joneses' license and when they actually discontinued the Schrocks's license.

Claim III
First Amendment Free Exercise of Religion

157.   Plaintiffs incorporate by reference all preceding paragraphs.

158.    The First Amendment forbids any law prohibiting or penalizing the free exercise of religion. U.S. Const. amend. I.

28

159. A plaintiff may demonstrate a free-exercise violation by showing that their religious exercise was burdened by a law that is not generally applicable or neutral.

160. The Plaintiffs' religious exercise was and is substantially burdened by DCF's revocation of their foster-care licenses.

161. Specifically, DCF, through the former Foster Parent Agreement, will not grant a foster-care license to a person unless that person agrees to use chosen pronouns or chosen names, affirm that gender is fluid, encourage children to "transition," and verbally affirm romantic relationships that go against their beliefs.

162. This substantially burdens Plaintiffs' religious exercise by forcing them to choose between the opportunity to become foster and adoptive parents and staying true to their religious convictions.

163. Former 110 C.M.R. 7.104(1)(d) is not neutral nor generally applicable because it imposes special disabilities based on religious beliefs, categorically excludes people from foster-care licenses based on religious beliefs, prefers certain religious and secular beliefs over the Plaintiffs' religious beliefs, and provides for categorical and individualized exemptions without extending an exemption to religious persons like Plaintiffs.

164. DCF's licensing regulations and procedures allow for exemptions of certain policies but not for those related to affirming a child's sexual orientation and gender identity. They also allow for individualized review of each foster family and place significant discretion in DCF employees as to the licensure of each individual family.

165. Because DCF's policy is not neutral or generally applicable, it triggers strict scrutiny. But DCF's policy does not serve any valid or compelling interest in a narrowly tailored way, and there are many less restrictive alternatives to achieving the State's legitimate goals that do not infringe Plaintiffs' free-exercise rights.

166.    Additionally, former 110 C.M.R. 7.104(1)(d) requires applicants to agree to speak certain words, like opposite-sex pronouns, and to engage in certain expressive activities, like affirming same-sex relationships, that express DCF's preferred views on human sexuality, as a condition for obtaining a foster-care license.

167.    These expressive activities substantially burden Plaintiffs' religious exercise and violate their conscience.

168.    DCF has therefore placed an unconstitutional condition on a Massachusetts foster-care license. In order to obtain such a license, Plaintiffs must promise to speak and act in a way that violates their religious beliefs.

169.    By conditioning Plaintiffs' ability to receive a foster-care license on their willingness to give up their First Amendment rights, former 110 C.M.R. 7.104(1)(d) imposes an unconstitutional condition on them in violation of their First Amendment rights.

170.    Further, "[a] plaintiff may also prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 n.1 (2022).

171.    DCF violated Plaintiffs' free-exercise rights by revoking their foster-care licenses after making statements demonstrating religious animus.

172.    Among other things, DCF displayed hostility toward Greg and Marianelly Schrock's religious beliefs and warned them not to "pray the gay away."

173.    DCF training materials also warn that children have a "right to be free from religious indoctrination that condemns or puts down [their] sexual orientation or gender identity or expression," and "[n]o one should make negative comments to [them]" about these topics, suggesting that Plaintiffs' religious beliefs on these topics are invalid.

174.    The stereotype and assumptions present in DCF's statements and training materials show religious animus. Combined with DCF's subsequent revocation of

the Schrocks' foster-care license based on their religion, DCF's actions violate the Free Exercise Clause of the First Amendment.

175. Each Defendant was personally involved in applying former 110 C.M.R. 7.104(1)(d) to the Joneses or the Schrocks, or had authority over and responsibility for applying the licensing rules, including 110 C.M.R. 7.104(1)(d) to the Joneses or the Schrocks.

176. Defendants acted contrary to clearly established law when they threatened to revoke the Joneses' license and when they actually discontinued the Schrocks' license.

Claim VI
Fourteenth Amendment Due Process Clause

177. Plaintiffs incorporate by reference all preceding paragraphs.

178. The Fourteenth Amendment's Due Process Clause prohibits states from enacting vague laws that fail to provide fair notice of what is prohibited, or that are so standardless that they authorize or encourage discriminatory enforcement.

179. The Department's LGBTQ+ Requirements are unconstitutionally vague, facially and as applied to Plaintiffs, because the policy fails to define relevant terms, fails to provide Plaintiffs with fair notice of what is prohibited, and encourages discriminatory enforcement against religious viewpoints.

180. 110 C.M.R. 7.104(1)(d) is unconstitutionally vague as it fails to define how applicants must "support[ ] and respect[ ] a child's individual identity and needs."

181. The LGBTQIA+ Nondiscrimination Policy is unconstitutionally vague as it fails to define what it means for "[a]ll individuals who interact with children and families [to] be respectful of how individuals ask to be identified." Ex. 7 at 2.

182. This policy also gives DCF official unbridled discretion to police foster parents' speech and make licensure decisions by simply labeling any speech or behavior

they disagree with as a failure to support or respect a child's individual identity or needs.

183.   DCF claims that the Joneses and the Schrocks are no longer in danger of losing their foster-care licenses because of their religious beliefs.

184.   But supporting a "child's individual identity and needs," or respecting how children "ask to be identified," facially requires foster parents to use a child's chosen name and pronouns or to otherwise affirm the child's sexual orientation and gender identity.

185.   And no regulation or practice prevents the Department from interpreting 110 C.M.R. 7.104(1)(d) to require affirmation of a child's sexual orientation, gender identity, and gender expression.

186.   Again, either of these phrases could be interpreted to require foster parents to affirm a child's sexual orientation, gender identity, and gender expression.

187.   And nothing prevents the Department from using the Foster Parent Agreement Form to revoke the licenses of religious foster parents in the future.

188.   Therefore, the Department's LGBTQ+ Requirements, facially and as applied Plaintiffs, violate the Due Process Clause of the Fourteenth Amendment.


Claim VII
Fourteenth Amendment Equal Protection

189.   Plaintiffs incorporate by reference all preceding paragraphs.

190.   The Fourteenth Amendment guarantees "the equal protection of the laws." U.S. Const. amend. XIV, § 1.

191.   Former 110 C.M.R. 7.104(1)(d), as applied by DCF, excludes applicants with religious beliefs the Department disfavors.

192.   By excluding the plaintiffs from foster-care licensure because of their religious beliefs, former 110 C.M.R. 7.104(1)(d) invidiously discriminates based on

32

religion and treats Plaintiffs worse than similarly situated persons who do not share their religious beliefs.

193.    Additionally, by excluding Plaintiffs from foster-care licensure based on their viewpoints regarding sexual orientation and gender identity, former 110 C.M.R. 7.104(1)(d) invidiously discriminates based on viewpoint and treats Plaintiffs worse than similarly situated persons who do not share their views.

194.    Accordingly, DCF's application of former 110 C.M.R. 7.104(1)(d) violates the Equal Protection Clause.

## Prayer for Relief

Plaintiffs respectfully request that this Court enter judgment against Defendants and provide Plaintiffs with the following relief:

  a.  A declaration that former 110 C.M.R. 7.104(1)(d), facially and as applied to Plaintiffs and similarly situated foster-care applicants, violated and continues to violate their constitutionally protected rights to free speech, free association, religious exercise, due process, and equal protection of the law;

  b.  A preliminary and permanent injunction to stop Defendants, and any person acting in concert with them, from enforcing former 110 C.M.R. 7.104(1)(d) to deny Plaintiffs and other similarly situated persons a license to foster or to adopt based on constitutionally protected rights to free speech, free association, religious exercise, due process, and equal protection of the law;

  c.  A declaration that 110 C.M.R. 7.104(1)(d), facially and as applied to Plaintiffs and similarly situated foster-care applicants, violates their constitutionally protected rights to due process.

33

d.  A preliminary and permanent injunction to stop Defendants, and any person acting in concert with them, from enforcing amended 110 C.M.R. 7.104(1)(d) to deny Plaintiffs and other similarly situated persons a license to foster or to adopt based on constitutionally protected rights to due process;

e.  That this Court award Plaintiffs nominal damages against Defendants in their personal capacities;

f.  That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorney fees in accordance with 42 U.S.C. § 1988;

g.  That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

h.  That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

i.  That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

j.  That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted the 11th day of May, 2026,


/s/Sam Whiting
Sam Whiting
(MA Bar No. 711930)*
**Massachusetts Liberty Legal Center**
P.O. Box 2616
Acton, MA 01720
Telephone: (774) 462-7043
sam@malibertylegal.org


/s/Johannes Widmalm-Delphonse
Johannes Widmalm-Delphonse
(VA Bar No. 96040)**
Mallory Sleight
(NE Bar No. 27129)**
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jwidmalmdelphonse@adflegal.org
msleight@adflegal.org

Henry W. Frampton, IV
(SC Bar No. 75314)**
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
hframpton@adflegal.org


*Counsel for Plaintiffs*
*\* Local Counsel*
*\*\*Pro hac vice application forthcoming*


/s/Andrew Nussbaum
Andrew Nussbaum
(CO Bar No. 50391)**
**First & Fourteenth PLLC**
2 N. Cascade Avenue
Suite 1430
Colorado Springs, CO 80903
Telephone: (719) 428-2386
andrew@first-fourteenth.com

James Compton
(MD Bar No. 2011040002)**
**First & Fourteenth PLLC**
800 Connecticut Avenue NW
Suite 300
Washington, D.C. 20006
Telephone: (202) 998-7975
james@first-fourteenth.com

35

## DECLARATION UNDER PENALTY OF PERJURY

I, Audrey Jones, a citizen of the United States and a resident of the State of Massachusetts, verify under penalty of perjury that I have read the above complaint and that its contents related to my personal experience are true and correct to the best of my knowledge.

Executed this 11th day of May, 2026, Worcester County, Massachusetts.

_____
Audrey Jones

36

## DECLARATION UNDER PENALTY OF PERJURY

I, Nicholas Jones, a citizen of the United States and a resident of the State of Massachusetts, verify under penalty of perjury that I have read the above complaint and that its contents related to my personal experience are true and correct to the best of my knowledge.

Executed this 11th day of May, 2026, Worcester County, Massachusetts.

_____
Nicholas Jones

37

## DECLARATION UNDER PENALTY OF PERJURY

I, Greg Schrock, a citizen of the United States and a resident of the State of Massachusetts, verify under penalty of perjury that I have read the above complaint and that its contents related to my personal experience are true and correct to the best of my knowledge.

Executed this 11th day of May, 2026, Middlesex County, Massachusetts.

_____
Greg Schrock

## DECLARATION UNDER PENALTY OF PERJURY

I, Marianelly Schrock, a citizen of the United States and a resident of the State of Massachusetts, verify under penalty of perjury that I have read the above complaint and that its contents related to my personal experience are true and correct to the best of my knowledge.

Executed this 11th day of May, 2026, Middlesex County, Massachusetts.

*Marianelly Schrock*

Marianelly Schrock

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of May, 2026, I electronically filed the Amended Complaint with the Clerk of Court using the ECF system, which will send a notification to all counsel of record.

/s/ *Johannes Widmalm-Delphonse*
Johannes Widmalm-Delphonse
*Attorney for Plaintiffs*