# EXHIBIT 1

| DCF | COMMONWEALTH OF MASSACHUSETTS ~ DEPARTMENT OF CHILDREN AND FAMILIES | |
|---|---|---|
| | **Policy Name**: Licensing of Foster, Pre-Adoptive, and Kinship Families | |
| | **Policy #:**  23-01 | **Approved by:** |
| | **Effective Date:**  02/27/2023 | |
| | **Revision Date(s):** 12/18/2020;1/7/2021;7/19/2021;8/25/2022;11/10/2022;1/28/2023; 2/27/2025; 12/12/2025 | |
| | **Federal Legal Reference(s):** 42 USC, sec 671 and 675 (10-12) ; 45 CFR, sec 1356 | |
| | **Massachusetts Legal Reference(s):** MGL c. 18B, § 2; MGL c. 119, §§ 23, 23A, 26A and 33; MGL c. 15D, §§ 6-7; 110 CMR 7.100, et seq ; 110 CMR 18.00 ; 606 CMR 5.00 ; and 606 CMR 7.00 | |

# LICENSING OF FOSTER, PRE-ADOPTIVE, AND KINSHIP FAMILIES

**Table of Contents**

I. **Policy**

II. **Procedures**

    A.  **Definitions/Key Terms**　　　　　　　　　　　　　**3**
    B.  **Roles and Responsibilities**　　　　　　　　　　　**4**
    C.  **Immediate Placement with Kin**　　　　　　　　　**7**
    D.  **Recruitment**　　　　　　　　　　　　　　　　**13**
    E.  **Application Review**　　　　　　　　　　　　　　**14**
    F.  **Caregiver and Training Assessment**　　　　　　　**17**
    G.  **Licensing Review Team**　　　　　　　　　　　　**26**
    H.  **Post-Licensing Assessments**　　　　　　　　　　**28**
    I.  **Appendices**　　　　　　　　　　　　　　　　　**37**
        A. Guides: Caregiver Training and Assessment, Annual Assessment, Interim Assessment, and Permanency Assessment
        B. Housing Standards for Foster and Pre-Adoptive Homes
        C. Licensing DCF Employees

## I. POLICY

The Department of Children and Families, foster parents, biological families, and communities collaborate to support children in the Department's care and custody. They work together to shorten the length of time a child is in foster care and the length of time it takes to achieve permanency. A safe, nurturing, and permanent family is the goal for every child in Department care. Placement decisions involve matching the specific needs of a child to a foster family who has the skills and supports to keep a child safe, care for the child's well-being, and ensure both permanency and continuity of significant relationships.  It is a process that is undertaken jointly, between the Department and the foster family.

Children living outside their home often do better when they live with extended family members or with people in their community circle. The Department works closely with the child's family and community to identify kin who might be able to care for the child if needed.  When placement with a kinship family is not possible, the Department recruits foster families from diverse communities.

The Department regards foster parents as valued partners. Foster parents keep children physically and emotionally safe by providing full-time care and protection. They establish a sense of normalcy for children, encouraging them to engage in age-appropriate activities and pursue educational success. They are trained to help children manage and process their feelings and reactions to trauma. They work together with the child's family and the Department to help children meet their goals and the goals of their Action Plan.

Foster parents help children maintain ties to their family, community, and culture. Foster parents involve the birth family in shared decision-making and facilitate communication and visitation when safe and appropriate to do so and in line with the child's permanency plan. Foster parents encourage the birth family's participation in their child's life and special events. Foster parents model parenting skills and support the birth parents in parenting their child. Foster parents recognize that foster care supplements but does not replace the child's relationship with their birth family.

All foster families must be licensed in accordance with this policy, 110 CMR 19.00 et seq, and MGL c. 119, § 26A. In order to apply to become a foster family, the applicant(s) must:

- Be a Massachusetts resident age 18 or older;
- Live in a home that is safe and has adequate space for a child;
- Have sufficient time and availability to serve as a foster parent;
- Have a stable source of income;
- Have functional literacy; and
- Be able to pass criminal and child welfare history checks.

The Department's approach to licensing occurs in purposeful stages of assessment.  This process is designed to be one of mutual selection. The Department and potential foster family together explore the family's capacity to provide safe and appropriate care. The Department explains expectations clearly, so potential foster families can make an informed decision to proceed with the licensing process. The family can choose to withdraw from the licensing process at any time.

There are three stages of assessment that occur before a foster family can be licensed. Each stage builds upon information learned about the family in the previous stage so that assessment is ongoing and cumulative, formulating a comprehensive clinical understanding of the family's caregiving capacity.

**Recruitment** –The Department performs a variety of activities that are designed to find foster families and provide them with a basic understanding of what becoming a foster family will mean for them.

**Application Review –** Interested families are invited to submit a completed application which provides information about whether they and their home meet the basic standards to provide a safe environment for a foster child.  The application review includes a home visit and the initiation of background checks.

**Caregiver Assessment** – The foster family is actively involved in assessing their ability to provide a physically and emotionally safe and stable home for a child in an approach that emphasizes shared decision-making, problem-solving, and mutual selection. Together, the Department and the

prospective foster parent(s) examine their motivation(s) for becoming a foster family; their parenting experience and/or knowledge; their experience with and knowledge of trauma; and their understanding of their own capabilities and limitations. The Department and the family work together to assess the family's capacity to care for children living in foster care. This is done by determining and building on prospective foster parents' understanding and use of the protective factors that strengthen families by integrating clinical assessment and training. These factors are: Knowledge of Parenting and Child Development, Building Social and Emotional Competence of Children, Parental Resilience, Social Connections, and Concrete Supports in Times of Need.

**Post-Licensing Assessments** – The Department and the foster family together review the foster family's provision of care on an annual basis or sooner as needed. The Department and the foster family jointly decide what assistance is needed to support the family's willingness and ability to continue providing foster care. The foster family confirms that they wish to continue in their role and the Department determines if the licensing standards continue to be met.

*Working with individuals who are Deaf or Hard of Hearing and individuals with Limited English Proficiency:* The Department secures interpreter services for individuals who identify as Limited English Proficient (LEP) in a timely manner. To secure services for individuals who are Deaf and Hard of Hearing, the Social Worker contacts the Department's identified contact with the Massachusetts Commission for the Deaf and Hard of Hearing (MCDHH) who can make requests directly from MCDHH. The Social Worker, or other Department staff, will not require or suggest that an individual who identifies as LEP bring their own interpreter or communication specialist to meetings. The Social Worker, or other Department staff, will not rely on an adult accompanying an individual who identifies as LEP to interpret for the individual UNLESS it is an emergency involving an imminent threat to the safety or welfare of an individual or the public and there is no other interpreter available; OR the individual specifically asks that the accompanying adult interpret or facilitate communication for them, the accompanying adult agrees to do so, and reliance on the adult is appropriate under the circumstances.

For all individuals who identify as LEP, documents must be translated and provided in the individual's preferred language.  The Social Worker arranges for the documents to be translated by using the Department's translation service contract in the Area Office. *For the purposes of this policy, documents requiring translation include but are not limited to applications, consent forms, and notification letters.*

## II.  PROCEDURES

### A.  DEFINITIONS/KEY TERMS
*Throughout this policy, the term "foster" is used to refer to unrelated foster, kinship foster, and pre-adoptive parents, families, and children, including Interstate Compact for the Placement of Children (ICPC) homes in Massachusetts. Throughout this policy, tasks that apply to the Foster Family Social Worker (FFSW) also apply to the Kinship Social Worker (KSW) except where otherwise specified.*

**Best Fit Capacity –** The number of children that the foster home should care for based on an assessment of their caregiving capacity. When determining the best fit capacity for a foster home, the needs of the children being placed, the needs of the children currently in the home, and caregiver's current ability to meet those needs must be considered.

**Foster Family –** An individual(s) who does not meet the definition of kinship and who is licensed to provide 24-hour out-of-home care for children in the custody or care of the Department.

**Hosting Regional / Area Office** - The Regional/Area Office/Director responsible for the foster/pre-adoptive family applicant or licensed foster/pre-adoptive family. This is normally determined by the geographic location of the home.

**Household members –** Any individual, regardless of age, who resides in a foster family home or who moves into the home with the intent to make it their residence. In addition, any individual who is temporarily visiting for more than 30 calendar days shall be considered a household member. Children/young adults in Department care or custody are not considered household members of the foster/pre-adoptive home for the purpose of this policy.

**Non-Household members –** Any individual who is present in the home on a recurring/routine basis; AND

they have a significant relationship with the parent(s) and/or household members, the nature of which creates the potential for unsupervised contact with children in the home (non-custodial parents, significant others, relatives, or close friends); OR they are present in the home for the purpose of serving in a caregiving role (e.g., babysitters).

**Kinship Family –** An individual(s) licensed or approved to provide 24-hour out-of-home care for children in the custody or care of the Department, who are either: (1) related by blood, marriage or adoption; (2) fictive kin including another individual(s) to whom the child and/or parent(s) ascribe the role of family based on cultural and affectional ties or individual family values; or (3) another individual(s) identified by the parent(s), child and/or the Department as a foster family for a specific child(ren) (e.g. schoolteacher, parent of friend, member of family's religious community).

**Limited English Proficient (LEP) –** An individual may self-identify as not fluent in speaking, reading, writing, or comprehending English with providers and staff.

**Maximum Licensed Capacity** – The number of children the foster home's physical space can accommodate.

**Placing Regional / Area Office -** The Regional/Area Office/Director responsible for a case in which a child is in need of placement.

**Reasonable and Prudent Parent Standard -** The standard characterized by careful and sensible parental decisions that maintain the health, safety, and best interests of a child, youth, or young adult while at the same time encouraging the emotional and developmental growth of the child, youth, or young adult. A caregiver uses this standard when determining whether to allow a child, youth, or young adult in foster care to participate in extracurricular, enrichment, cultural, and social activities.

## B.  ROLES AND RESPONSIBILITIES

1.  The *Area Director* is responsible for:
    o  supporting the foster care units in decision-making;
    o  participating in the development, management, and assessment of recruitment plans;
    o  participating in a Cross Unit Team Meeting or identifying a manager to attend; and
    o  approving immediate placement in kinship home when needed.

2.  The *Area/Regional Program Manager* over foster care is responsible for:
    o  supporting the foster care units in decision-making;
    o  participating in cross-unit meeting for an interim assessment;
    o  reviewing the caregiver assessment, annual or interim assessment, including the recommendations;
    o  sending the completed caregiver assessments to the licensing review team facilitator and scheduling the review;
    o  attending and assisting in the presentation of all the caregiver assessments to the licensing review team; and
    o  approving annual or interim assessments that result in continuing the foster/pre-adoptive family license.

3.  The *Central Office Recruitment Supervisors* are responsible for:
    o  managing, performing and recording recruitment activities;
    o  receiving the on-line applications and forwarding to the responsible region; and
    o  answering the statewide recruitment line.

4.  The assigned *Child's Social Worker* is responsible for:
    o  discussing with the child's family potential kinship placement resources;
    o  providing information about child needs and activities needed at the time of placement or within first week/month;
    o  arranging for and informing the placement of phone contact and first visit between child(ren) and parent(s);

- o   notifying kin in writing of child's placement into foster care within 30 days of placement; participating in Cross-Unit Team meeting for an interim assessment when designated; and
- o   providing information, annually and as needed, to the Licensing and Training Social Worker (LTSW).

5. The assigned *Child's Social Worker Supervisor* is responsible for supporting the Social Worker to complete the activities to permit first placement of child with kin, and:
   - o   contacting, if needed, kinship families to discuss possible placement;
   - o   requesting *Kinship Social Worker* to search for kin;
   - o   requesting a family group conferencing, if needed;
   - o   participating in Cross-Unit Team meeting for an interim assessment when designated; and
   - o   supporting the Social Worker in other activities required during annual assessments and interim assessments.

6. The *Emergency Response Worker (ERW)* is responsible for:
   - o   discussing with the child's family potential kinship placement resources;
   - o   conducting caregiver assessment activities to permit immediate placement of child with kin;
   - o   requesting from police CORIs on kinship foster parents and household members age 15 and older;
   - o   providing the kinship placement with information about child and child's needs; and
   - o   placing child in a kinship home or other placement.

7. The *Foster/Pre-Adoptive Parent* is responsible for:
   - o   attending an informational session and submitting a completed foster parent application;
   - o   participating in the application review, and if applicable, the caregiver assessment process and the annual assessments or interim assessments;
   - o   providing documentation requested by the Department as part of the application review, the caregiver assessment and/or annual assessments or interim assessments;
   - o   attending the Department required training program and completing a reflection log;
   - o   participate in the development of a support plan, if needed; and
   - o   fulfilling the responsibilities in the Foster Parent Agreement.

8. The *Foster Family Social Worker (FFSW)* is responsible for:
   - o   completing associated activities as needed when there are reported changes to the foster/pre-adoptive home;
   - o   communicating with and supporting the foster/pre-adoptive family during an interim assessment or closing;
   - o   participating in Cross-Unit Team meeting for an interim assessment; and
   - o   providing information, annually and as needed, to the Licensing and Training Social Worker.

9. The *Foster Family Supervisor* is responsible for supporting the Foster Family Social Worker in completing activities to support the foster family and:
   - o   attending the licensing review team meetings;
   - o   assigning licensed homes to a FFSW;
   - o   participating in Cross-Unit Team meeting for an interim assessment; and
   - o   notifying the *License and Training Supervisor* of any changes in the foster/pre-adoptive family or home.

10. The **Hotline On-Call Supervisor (OCS)** is responsible for supporting the ERW in immediate placement and caregiver assessment activities and decision-making and:
   - o   checking DCF history for kinship foster parents and household members age 15 and older;
   - o   seeking AD/designee approval when needed to allow immediate placement with kin;
   - o   approving placement with kin if there are no criminal or child welfare history;
   - o   determining immediate placement if kin are not available;
   - o   entering placement information in electronic record; and
   - o   notifying foster care supervisor or worker of placement.

11. The ***Kinship Social Worker*** is responsible for:
   - discussing with the child's family other potential kinship placement resources;
   - rapidly conducting and documenting the caregiver assessment activities to permit immediate placement of a child with kin;
   - developing a support plan if needed;
   - providing information about child needs and activities needed within the first week;
   - providing information on the caregiver training and assessment process;
   - participating in the review of the caregiver assessment for kinship homes to the licensing review team; and
   - completing activities required of a FFSW for assigned kinship homes.

12. The ***Kinship Supervisor*** is responsible for supporting Kinship Worker in completing the activities to permit first placement of child with kin and:
   - assigning kinship home to Kinship Social Worker;
   - processing the criminal and child welfare history checks to permit immediate placement of a child with kin;
   - reviewing and approving the initial activities of to permit immediate placement of a child with kin;
   - may participate in the review of the caregiver assessment for kinship homes at the licensing review team; and
   - participating in cross-unit meeting for an interim assessment.

13. The **Licensing Review Team Members** are responsible for:
   - attending the licensing review team meetings;
   - preparing for the licensing review team by reading the caregiver assessment and the supporting documentation for any reviews needed;
   - reviewing and, when needed, modifying the training and support plan;
   - participating in decision-making; and
   - reviewing the capacity recommendation and modifying when needed.

14. The ***Licensing Review Team Facilitating Manager*** is responsible for:
   - chairing the LRT;
   - participating as a member of the LRT;
   - recording the decision and outcome of the LRT; and
   - forwarding the licensing review team recommendation and caregiver assessment to another manager for review and final approval, when needed.

15. The ***Recruiter*** is responsible for:
   - planning, developing, documenting and delivering informational sessions, both group and individual and other recruitment activities;
   - reviewing and confirming the completeness of the prospective foster parent (PFP) application;
   - completing the application review activities, including beginning the assessment of prospective foster parents and assessing the basic housing requirements;
   - providing, reviewing and discussing foster parent requirements, including discussing barriers and strategizing solutions with the PFP;
   - providing documents the PFP needs to complete the foster parent requirements;
   - following up and developing resolution plans with an PFP on hold;
   - requesting manager review of alternative training requirements; and
   - enrolling PFP in required training program.

16. The ***Recruitment Supervisor (regional)*** is responsible for supporting the Recruiters in information session and application review activities and:
   - support the planning, developing and conducting of informational sessions;
   - resolving issues for homes on hold;
   - requesting manager review of alternative training requirements;
   - reviewing Application Review documentation;
   - forwarding viable homes to Trainer and Assessment Worker/Supervisor; and
   - managing recruitment activities.

17. The **Regional Director** is responsible for:
    o   participating in the development, management, and assessment of recruitment plans;
    o   reviewing and approving the caregiver assessment, annual or interim assessment, when needed; and
    o   approving immediate placement in kinship home when needed.

18. The assigned *Licensing and Training Social Worker (LTSW)* is responsible for:
    o   conducting DCF required training for foster/pre-adoptive and kinship parents;
    o   assessing the viability of prospective foster and kinship parents and families;
    o   completing the activities to fully assess the foster and kinship parents and families;
    o   documenting the assessment of the prospective foster and kinship parents and family;
    o   presenting the caregiver assessment, including recommendations to the licensing review team;
    o   notifying prospective foster and kinship family of outcome of caregiver assessment;
    o   development of foster parent support plan, if needed;
    o   completing the activities, including documentation, to update the caregiver assessment through annual assessments and/or interim assessments; and
    o   notify unrelated and kinship families of outcome of annual and/or interim assessments.

19. The assigned *Licensing and Training Supervisor* is responsible for supporting the LTSW in completing the Caregiver Training and Assessment Activities, annual assessments and interim assessments activities and making a licensing recommendation and:
    o   assigning the caregiver, annual, and interim assessments to a LTSW;
    o   determining the Trainer and Assessment representative to attend a Cross-Unit Team Meeting;
    o   reviewing the caregiver assessment, annual assessments and interim assessments; and
    o   assisting in the presentation of all the caregiver assessments.


## C.   IMMEDIATE KINSHIP PLACEMENTS


The Department is a kin-first agency. When family separation occurs, the Department strives to place a child with kin. Placement with kin provides continuity for the child and reduces trauma. The Department conducts a provisional but comprehensive assessment of the kinship foster family's caregiving capacity to determine if the kinship foster family can meet the particular needs of the child. The Department places the child with the kinship foster family before they are licensed if the Department determines that they can meet the child's needs. The kinship foster family completes Caregiver Training and Assessment while the child is living there.

Immediate placements are intended to be same day placements. They may occur at the time of family separation or later, after the child has been placed in an unrelated foster home when kin is identified. The Department strives to make the child's first kinship placement their only placement. In immediate placements, the Department is looking for the kinship foster family who is best able to meet the child's immediate needs and fulfill the short-term responsibilities of a kinship foster parent. It is best practice to plan for permanency at the same time. However, the best permanent placement may not be available or apparent during an immediate placement.

Immediate kinship placement requires a coordinated effort across multiple units and sometimes offices. Anyone can and should complete Immediate Placement activities in order to facilitate a quick and safe kinship placement for the child. Staff who are not part of the Kinship Unit and staff from multiple offices may be asked to help in this process. As a result, documentation of information gathered and communication of the clinical assessment of kinship family members is extremely important. The documentation of activities during immediate placement is the responsibility of the person completing the activity. This individual will be different depending on the time of day and the situation. Information learned about the kinship family during immediate kinship placement forms the basis of areas of exploration and further discussion during Caregiver Training and Assessment.

**Identifying Kinship Foster Families**

1. There are many ways that kin become known to the Department. Some ways include:

   - collaterals or kin collaterals involved with the family's response/case;
   - kin identified by the parents or the child;
   - kin identified by the family's religious or cultural community;
   - kin who arrive during family separation;
   - kin who are already with the child before Department involvement;
   - kin who come to court hearings;
   - kin who are guardians or adoptive parents of siblings; and
   - kin identified in a family find.

   The child's social worker is responsible for identifying kin as part of their ongoing work with the family. They maintain a list of kin collaterals and updated contact information in the family's electronic case record. They talk to the child's parent(s) to understand who they would want taking care of their child should family separation occur. They provide this information to the Kinship Unit when separation occurs and also provide any additional information they may know about the ability of individuals on the list to care for the child.

2. The child's social worker exercises due diligence to identify and notify kin within thirty calendar days of family separation. This notice:

   - explains options to participate in the care and placement of the child;
   - describes the requirements to become a kinship foster family; and
   - describes the supports and services available to foster children and foster families, including support payments.

**Managing Placement when there are Multiple Kinship Families**

3. The Department decides where to place the child when there are multiple kinship families who come forward. The Department considers many factors when making their decision including:

   - the needs of the child as identified by the child's clinical team;
   - the needs of the child as identified by their parents;
   - the wishes of the child;
   - the wishes of their parents;
   - the wishes of the kinship families who come forward; and
   - proximity to the child's school, friends, and community. (See: Safe and Supported Placements Policy.)

   The Department may explore several kinship families before choosing a permanent placement. This may occur before or after an immediate placement has been made. The Department may facilitate conversations between family members when there are multiple kinship families involved to help the families come to a decision about the role each will assume in caring for the child and which would be most suitable for a long-term placement. There may be multiple offices involved if there are multiple kinship families being explored for placement.

4. Ultimately, the Department chooses where to place the child based upon the child's needs and a provisional assessment of the caregiving capacity of the available kinship families. The KSW maintains communication with

Licensing of Foster, Pre-Adoptive, and Kinship Families                    Revised 12/12/2025

all kinship families involved about the Department's decision-making process.

**Managing Placement Across Offices**

5. The primary goal is to ensure safe and immediate placement with kin. When the potential kinship family resides in the catchment area of a different Area Office, the Kinship Unit in the hosting office completes the activities to facilitate immediate kinship placement.

6. The manager in the placing office contacts the manager in the hosting office to initiate the immediate placement activities. If the placing office does not hear back from the hosting office within two hours, the AD for the placing office contacts the AD in the hosting office to ensure timely response to the need for immediate placement. Staff from both offices will collaborate to ensure all activities are completed as soon as possible. The placing office may initiate and/or complete any immediate placement activities when it is deemed in the best interest of the child to expedite placement. The final decision to place the child with kin resides with the placing office.

**Contacting Kinship Families**

7. The child's social worker provides information about prospective kinship families to the Kinship unit when family separation occurs. The Supervisor assigns a Kinship Social Worker (KSW) immediately. The KSW contacts the kinship foster family who can provide the best possible placement for the child, if known. The KSW and their Supervisor consider the needs of the child and the wishes of the parents and the child when determining which kinship family to contact first. The KSW and their Supervisor also consider any additional information from the child's social worker about the kinship families. The KSW may contact multiple kinship families and assess which family to pursue immediate placement with.

During this initial conversation, the KSW confirms that the kinship family is interested in fostering the child and assesses if the kinship family can meet the immediate needs of the child. The KSW:

- discusses the reason(s) for family separation and the current condition of the child;
- discusses the immediate and short-term needs of the child, including any medical or behavioral health needs;
- determines how the kinship family can meet the immediate needs of the child (e.g., transportation to school/daycare/appointments) with services and supports in place as needed;
- receives verbal confirmation that the home meets the basic housing requirements (See: Application Review) and schedules a home visit to occur immediately; and
- obtains and documents verbal consent from all adult household members to run criminal and child welfare history checks.

**Check Criminal and Child Welfare History**

8. The KSW runs a criminal and child welfare history check on all household members age 15 and older.

- If the criminal and child welfare history check shows a Lifetime Disqualifying Crime, a Five-Year Disqualification, or disqualifying child welfare history, the Kinship Social Worker informs the family verbally and in writing that they are not eligible to become kinship foster parents at this time.
- If the criminal and child welfare history check result raises safety or clinical concerns, the Kinship Social Worker shares the results with the identified individual(s) and asks about:

- their involvement with the criminal justice and/or child welfare system,
- what steps they have taken to mitigate the reasons for their involvement, and
- how their history affects their caregiving capacity.

The individual(s) must consent to share results that raise safety or clinical concerns with foster parent applicants (and other adult household members as appropriate) in order to ensure a transparent and comprehensive assessment.

*During non-working hours:* The OCS checks child welfare history. The ERW contacts other entities as appropriate to obtain criminal history (e.g., local law enforcement).

**Assess Safety in the Home**

9. At the home visit, the KSW and the kinship family determine if the home is a safe environment for the child and confirms that the home meets the basic housing requirements (See: Application Review). The KSW ensures that there is an age-appropriate place for the child to sleep.

The KSW and the kinship family discuss any safety concerns in the home based on the age and development of the child. This includes concerns about:

- access to medications, cleaning supplies, and poisonous/hazardous materials (including alcohol and marijuana products),
- access to swimming pools, hot tubs, and spas,
- pets in the home,
- safe sleep, and
- smoking.

The Kinship Social Worker and the kinship family discuss their plan for emergencies (e.g., fire) and check that the home is clean, safe, and free of obvious fire and other hazards. The Kinship Social Worker confirms:

- working smoke detectors and carbon monoxide detectors on each level and near sleeping areas;
- at least one operable fire extinguisher in an easily accessible location;
- a working phone in the home while foster children are present;
- first aid supplies; and
- weapons/firearms in the home are secured and inaccessible to children.

The KSW and the kinship family plan how the family will resolve any outstanding safety issues. A manager can approve proceeding with an immediate placement as long as the family agrees to fix outstanding safety issues within two calendar days. The KSW visits the family's home to check that they resolved the outstanding safety issues within the given timeframe.

*During non-working hours:* The ERW confirms the home meets the basic housing requirements and discusses any safety concerns in the home based on the age and development of the child.

**Assess the Kinship Family**

10. The KSW must speak with each prospective kinship foster parent in the household if possible. The amount of time spent in conversation will vary depending on the specific situation. If this meeting is the first contact with the kinship foster family, the KSW obtains and documents verbal consent

---

*Chapter V: Placement Support*                                                10

from all adult household members to run criminal and child welfare history checks.

The KSW determines if the prospective kinship foster parents can provide a safe, stable, and nurturing placement for the child. The KSW assesses if they are capable of keeping the child safe and if they are capable of performing the duties of a foster parent. Topics of conversation should include but are not limited to:

- what safety concerns led to family separation. The KSW ensures that the kinship foster parents understand their role in keeping the child safe.

- the child and their needs and routines if known. This includes any immediate medical or behavioral health needs of the child.

- next steps for the child, including school attendance, contact with parents within 24-48 hours, visitation within five working days, and the medical screening within seven calendar days. The KSW assesses the foster parent's ability to meet these responsibilities and their comfort level around facilitating communication and visitation between the child and their parents within the parameters set forth by the Department.

- next steps in the open case and in the licensing process. The KSW gives an outline of what the kinship family can expect over the next few days (e.g., court proceedings, visits from Department staff).

The KSW and the kinship foster parents assess the short terms needs of the kinship foster family and form a plan to meet those needs. The KSW helps the family access services and supports as appropriate (e.g., transportation, daycare).

*During non-working hours:* The ERW conducts these activities.

11. If possible, the KSW speaks with other household members according to their age, development, and role. The KSW uses these conversations to further assess the family's caregiving capacity by exploring the strengths of alternate caregivers in the home and by verifying information gathered in interviews with the kinship foster parents.

**Obtain Approval for Placement**

12. The KSW and their supervisor together use all information known about the kinship family to recommend placing the child. The APM approves placing the child with the kinship family, except as noted below. The KSW obtains a complete signed emergency application from the kinship foster parents. The KSW gives the kin family their contact information, the Hotline number, the Foster Parent Helpline number, the number of the office to which the case is assigned, and a Letter of Authorization. The KSW gives the name and number of the child's social worker if known.

- If approval is needed due to a CORI, SORI, child welfare history or safety issue identified in the home, the Area Director/designee or Regional Director/designee approves placing the child with the kinship family (See: Background Records Check Policy).

- The Regional Director/designee may approve placements above the total number of children permitted in the Department's regulations (i.e., 6 total foster children) for the purpose of allowing:

  − a parenting youth in foster care to remain with the child of the parenting youth;

  − siblings to remain together;

           &ndash; a child with an established meaningful relationship with the family to be placed or remain with the family; or

           o a family with special training or skills to provide care to a child who has a severe disability.

- If approval is needed to place a child under age 12 in a foster home with a Pit Bull, Rottweiler, German Shepherd, or dog that mixes two out of these three breeds, the AD/Designee may approve the placement by taking into account the safety considerations set forth in Department regulations.

*During non-working hours:* The OCS approves placing the child with the kinship family. If approval is needed due to the exceptions noted above, the OCS approves in consultation with the on-call manager. The ERW provides the kinship foster parents with the phone numbers noted above and obtains a signed emergency application from the kinship foster parents if possible.

**Placement Follow-Up**

13. Within one working day of an immediate placement, the KSW contacts the kinship family to check in and connect the family to additional services and supports as needed. The KSW begins educating the kinship foster parents about the role and responsibilities of foster parents, including how to respond to common reactions to trauma. Together they strategize ways in which to handle the stress of integrating a child in crisis into their family.

The KSW asks the family about any barriers that could prevent them from fulfilling their foster parent responsibilities and helps them strategize solutions. The KSW and the kinship foster parent(s) together explore the kinship foster parent's current physical and mental health and how either could impact their caregiving capacity.

The KSW reviews the licensing process and provides and goes over the checklist of requirements and timeline of activities. They recommend that the kinship family schedule an appointment to register their fingerprints and any needed medical appointments as soon as possible. They also recommend that the kinship family obtains needed documentation as soon as possible (e.g., pet license and vaccination records, BRC documentation).

The KSW and the child's social worker collaborate to give the family all placement documents within three working days of placement.

**Complete Documentation**

14. The KSW Supervisor documents the child's placement by completing the service referral on the same day as placement.

15. The KSW processes the kinship foster family's application and runs criminal and child welfare history checks if needed. The KSW requests police responses to the home and applicable out of state and out of country child welfare history checks. The KSW connects the kinship family to foster parent training.

16. The kinship foster family proceeds to Caregiver Training and Assessment and the family is assigned to a LTSW. The KSW retains their assignment to the kinship family and provides ongoing support throughout Caregiver Training and Assessment.

**Request for More Time**

17. Immediate placements are intended to be same day placements. However, either the kinship foster family or the KSW can request more time if needed.

- The kinship foster family may request more time when they are not able to resolve a safety issue in the home within two calendar

days but they are committed to fixing the issue. The kinship foster family informs the KSW when the safety issue has been resolved. The KSW visits the home to confirm that the safety issue has been resolved before placing the child.

- In limited circumstances when there are safety or clinical concerns, the KSW may need more time in which to complete a provisional assessment of the kinship foster family's caregiving capacity. The Department may take up to one week to make their decision about placement. If the Department needs longer than a week to make a decision about placement, then the placement decision can be deferred until Caregiver Training and Assessment is initiated.

| | |
|---|---|
| **Defer Placement** | 18. The Department can also decide to do a full Caregiver Training and Assessment before making a placement decision when there are safety or clinical concerns that need to be addressed in the context of a full clinical assessment. However, an immediate placement can occur at any point during Caregiver Training and Assessment once the safety or clinical concern has been resolved. |
| **When Kin is Located Outside Massachusetts** | 19. The Department identifies a short-term placement for the child that meets their individual needs, ideally with kin, when a long-term placement has been identified for them with a kinship family who lives outside Massachusetts. The child's social worker initiates the ICPC (Interstate Compact on the Placement of Children) process to license the out-of-state kinship home. (See: Safe and Supported Placements Policy.) |

## D.  PROCEDURES: RECRUITMENT

When placement with a kinship family is not possible, the Department welcomes and recruits foster families from diverse communities. Children in care come from many different backgrounds, so it is important to have a group of diverse foster parents, who understand and have compassion for their experiences. The Department does not deny any adult the opportunity to become a foster family on the basis of race, color, age, biological sex, ethnicity, marital status, sexual orientation, gender identity or expression, religion, creed, ancestry, national origin, language, disability or veteran's status.

The goal of Recruitment is to engage families throughout Massachusetts in conversations about foster care and adoption and mobilize them to participate in the licensing process. Recruiters share information, answer questions, and address concerns so that a prospective foster family can make an informed decision about applying.

Every family will make their own decision about when to apply to become a foster family. The Department summarizes information learned during the recruitment process to help inform the basis for areas of exploration and further discussion in later stages of assessment.

| | |
|---|---|
| **Manage Recruitment Activities** | 20. The Recruiters, including Central Office Recruitment Supervisors, carry out a variety of recruitment efforts on statewide, regional, and local levels, including community events, multi-media campaigns, and written materials. The Department also provides a dedicated phone line to answer questions from prospective foster families. The Recruiters, including Central Office Recruitment Supervisors, maintain a record of recruitment activities and a record of interested people.<br><br>The Department creates a recruitment plan to identify and meet the needs of children living in foster care which targets new families to provide homes for specific populations. The Department adjusts the recruitment plan as needed. |
| **Hold Information Sessions** | 21. After someone has expressed interest in becoming a foster family (in person, on the phone, or by submitting an online application), the Recruiter contacts the prospective foster family within five working days |

and encourages them to attend a group information session. Group information sessions are the preferred way to communicate important information to prospective foster parent(s). The Recruiter provides a one-on-one information session in person (or by phone if necessary) if the prospective foster parent(s) is unable to attend a group information session.

22. At information sessions, the Recruiter discusses the role of a foster parent and how they provide for the safety and well-being needs of children while also helping to facilitate permanency for them, whether through reunification, placement with kinship or adoption. They describe the licensing process and give out a suggested timeline of activities and a checklist of requirements. The Recruiter presents information and proposes questions that help families start to consider what becoming a foster family will mean for them. The Recruiter both answers questions and asks questions to encourage self-examination of their capacity to become a foster parent.

**Submit Application**    23. After attending an information session, the prospective foster parent(s) fill out an application. The Recruiter confirms that their application is complete, or requests additional materials as needed. The prospective foster family then proceeds to Application Review.

**Check In with Prospective Families**    24. The Recruiter maintains open communication with families who have not yet submitted an application following an information session. The Recruiter answers additional questions the family may have and discusses concerns. The Recruiter helps them explore if becoming a foster family is the right decision for their family. If the family chooses not to apply, the Recruiter records their reasons. The Recruiter reaches out to the family at least twice in the forty working days after their information session. The Recruiter closes active recruitment after forty working days.

## E.   PROCEDURES: APPLICATION REVIEW

Application Review begins after the prospective foster family has both attended an information session and submitted a complete application. The Recruiter continues to build their understanding of the prospective foster family, using their application and previous interactions to inform further conversation. Application Review includes an initial home visit to check that the prospective foster family's home meets the basic housing requirements and to discuss next steps. The Department also begins background records checks on all household members age 15 or older. Application Review should be completed within 20 working days.

**Schedule a Home Visit**    1. Within five working days of receiving a completed application, the Recruiter contacts the prospective foster family to initiate application review and schedule a home visit. The Recruiter puts their application on hold if the Department is unable to reach the family within 20 working days or if the prospective foster family is unable to schedule a visit within that time.

**Check Criminal and Child Welfare History**    2. Prior to the scheduled home visit, the Recruiter checks the criminal and child welfare history of all household members age 15 and older (and those younger if concerns exist). This includes CORI (Criminal Offender Record Information), SORI (Sexual Offender Record Information), and DCF History Checks. The Recruiter closes the family's application if the check shows a Lifetime Disqualifying Crime, a Five-Year Disqualification, or disqualifying child welfare history. (See: Background Records Check Policy.)

- The Recruiter requests a child welfare history check from the child welfare agencies of other states or the military, territorial, or Indian tribal authorities when any household member age 15 or older has lived outside Massachusetts in the last five years.
- The Recruiter may request child welfare history from the appropriate authority in other countries when any household member age 15 or older has lived outside the U.S. in the last five years.

3. The Recruiter shares results from the check with the identified individuals, discusses the results with them, and explains any documentation the individual will need to provide if they wish to continue with the licensing process. The individual must provide written consent to share results that raise safety or clinical concerns with foster parent applicants (and other adult household members as appropriate) in order to ensure a transparent and comprehensive assessment. The Recruiter closes their application if the identified person does not wish to continue.

   The Recruiter asks the individual to provide documentation within 20 working days of the start of Caregiver Training and Assessment, but they can choose to complete this step sooner. The initial home visit can occur before the Recruiter receives documentation.

   The LTSW discusses results and documentation during the Caregiver Assessment.

4. **If the criminal or child welfare history raises safety or clinical concerns**, the Recruiter meets with their supervisor to discuss the application, the history, observations of the prospective foster family, and anything else known about the prospective foster family. The Recruiter and their supervisor together create a plan to address safety concerns, which could include but is not limited to scheduling an office visit before the home visit and/or visiting the home with another worker. The Recruiter and their supervisor may also consult with their manager about their concerns prior to the first home visit.

   The Recruiter and their supervisor can make a recommendation to close the family's application when there are safety or clinical concerns about a prospective foster parent's caregiving capacity. Their manager approves closing the family's application.

**Request Police Responses**

5. Prior to the scheduled home visit, the Recruiter requests police responses to the home over the last two years. This includes anywhere the prospective foster parent(s) lived over the past two years, including out of state addresses. The Recruiter only evaluates police responses that raise safety or clinical concerns. The initial home visit can occur before the police responses request is returned.

   The Recruiter can move forward without receiving police responses. Recruiter documents attempts made to obtain the information if the Recruiter's request is not returned. The LTSW discusses police responses with the family during the Caregiver Assessment.

**Check Basic Housing Requirements**

6. At the home visit, the Recruiter and the prospective foster parent(s) review if their home is suitable for a foster child by checking the following requirements:

   - A separate bedroom for children which provides at least 50 square feet (35 square feet for kinship families) per child and which is located:
     - on the first or second floor; or

---

*Chapter V: Placement Support*                                                                                    15

> o   on the basement level or above the second floor with two properly operating exits.
>
> • A properly operating kitchen with a sink, refrigerator, stove, and oven;
>
> • A properly operating bathroom with a sink, toilet, and tub or shower;
>
> • Adequate lighting, ventilation, electricity, and heat; and
>
> • Hot and cold running water.

The Recruiter will put the prospective foster family's application on hold in order to give them time to meet the basic housing requirements if needed. Otherwise, the prospective foster family can choose to withdraw from consideration.

**Discuss Next Steps**

7. At the home visit, the Recruiter debriefs the information session, answers questions, and discusses concerns. The Recruiter discusses next steps with the prospective foster parent(s) and again reviews the suggested timeline of activities and checklist of requirements. The Recruiter gives the prospective foster parent(s) the information and/or documentation they need to complete next steps. The Recruiter asks about potential barriers to completing these activities and requirements and helps the prospective foster parent(s) strategize how to address them (e.g., no primary care provider). The Recruiter specifically reminds the prospective foster family about the FBI fingerprinting and medical reference requirements. (Both are included in the Caregiver Assessment and the family does not need to complete either before proceeding.)

   • The Department requires a fingerprint-based check of the national crime data base for all household members age 15 and older. Prospective families are responsible for scheduling and attending an appointment to register their fingerprints. Because there are sometimes delays in registering fingerprints, the Recruiter asks the family to complete this step within 20 working days of the start of Caregiver Training and Assessment, but they can choose to complete it sooner.

   • The Department requires prospective foster parent(s) to have a recent (within the prior 12 months) physical exam from a licensed health care professional and requires that children living in the home are up to date on all immunizations. Prospective families are responsible for scheduling and attending medical appointments as needed to meet this requirement.

The Recruiter confirms that the family wishes to proceed to Caregiver Training and Assessment.

**Proceed to Caregiver Assessment**

8. The Recruiter writes a summary of information learned about the family in Application Review and Recruitment (e.g., characteristics of the family/home, what type of child(ren) the applicants are seeking to have placed in their home, etc.). Information about the family from Application Review and Recruitment is integrated into and frames the Caregiver Assessment.

The family proceeds to Caregiver Training and Assessment if:

   • their home meets the basic housing requirements;

   • all household members lack a disqualifying criminal or child welfare history; and

   • the Recruiter and their supervisor recommend that the family proceed.

9. The Recruitment Supervisor alerts the Licensing and Training Supervisor that the prospective foster family is ready to begin Caregiver Training and Assessment. The Licensing and Training Supervisor reviews information about the prospective foster family and assigns them to a LTSW within three working days.

10. The family enrolls in foster parent training. The AD/Designee may approve that no training enrollment is required if the family has previously completed Department approved training or an alternate training which may satisfy the Department's requirements.

**Put Application on Hold**

11. The Recruiter notifies the prospective foster family, in writing, if their application is put on hold. The Recruiter puts an application on hold if the family needs more time to schedule their first home visit or if they need time to meet the basic housing requirements. The family has 20 working days in which to resolve these reason(s), but they can reach out to the Recruiter as soon as they are ready to proceed. The Recruiter contacts the family if the Recruiter has not heard from them at the end of the Hold period. The Recruiter closes their application if the family has not resolved the reason(s) for the Hold by the end of the Hold period.

**Close Application**

12. The Recruiter closes a prospective foster family's application at their request or due to:

- a criminal or child welfare history result that shows a lifetime or five-year disqualification or disqualifying child welfare history;

- a household member who doesn't agree to disclose criminal or child welfare history results that raise safety or clinical concerns to foster parent applicants (or other adult household members as appropriate);

- safety or clinical concerns when the Recruiter, their supervisor, and manager recommend to close;

- missing basic housing requirements; or

- a failure to resolve reason(s) for a Hold within 20 working days.

The Recruiter documents the reason(s) for closure.

The Recruiter notifies the family in writing that their application has been closed. The family has the right to request a Grievance if they disagree with the Department's decision to close their application.

**Re-Open a Closed Application**

13. The prospective foster family can contact the Department and request to re-open their application within six months if they voluntarily closed their application or if they were closed because they did not resolve the reason(s) for a Hold within the given timeframe.

- The Recruiter must review the basic housing requirements if the prospective foster family's address has changed.

- The Recruiter must run new criminal and child welfare history checks if the last check is 12 months old or older.

After six months, the prospective foster family must submit a new application.

## F. PROCEDURES: CAREGIVER TRAINING AND ASSESSMENT

The Department uses everything learned about the family in Recruitment and Application Review to develop a thorough assessment of the family's caregiving capacity and guide further inquiry during Caregiver Training and Assessment. Caregiver Training and Assessment should be completed and submitted to the APM within 60 working days *For Kinship Families:* Caregiver Training and Assessment should be completed within forty-five working days. The LTSW can request an extension of five working

days when there is a barrier to completing a Kinship Caregiver Assessment. Their supervisor, in consultation with their manager, approves the extension. For ICPC Requests: The LTSW completes the Caregiver Training and Assessment upon assignment from the Central Office ICPC Unit.

The LTSW assesses families during training and through interviews with family members, observations of the family's interactions and of the family's home and contact with references. The prospective foster parents are able to evaluate, through self-reflection and discussion, whether fostering towards reunification or adoption is something they have the desire and ability to do.  At the same time, the LTSW can evaluate whether they have the capacity and dedication to become a foster parent. Both the prospective foster parents and the LTSW can then make an informed decision to proceed.

Foster parents are committed to offering supportive and loving child-specific environments while helping to facilitate permanency for the child through reunification or adoption. Prospective foster parents show that they are capable of maintaining such an environment by demonstrating certain qualities within the Strengthening Families Protective Factors Framework. This framework highlights the conditions that are present in families that protect children and minimize risk. The protective factors contain the skills, knowledge, attributes, and abilities of caregivers that allow them to provide for the safety, permanency, and well-being of children. The LTSW uses the following protective factors to evaluate the prospective family's caregiving capacity:

**Knowledge of Parenting and Child Development**

- Foster parents understand childhood development, recognizing that each child will have different safety and well-being needs based on their age and development.
- Foster parents understand that children living in foster care have trauma histories that can affect their behavior and development. Foster parents use positive discipline methods that are consistent with a child's age, development, and trauma history.
- Foster parents value education and commit to helping children living in foster care attain educational success.
- Foster parents know the warning signs of trafficking, exploitation, and teen dating violence and talk with children about personal safety in developmentally appropriate ways.

**Building Social and Emotional Competence of Children**

- Foster parents understand that nurturing and attachment are important for healthy brain development and know how to develop a nurturing and responsive relationship with children.
- Foster parents assist foster children in handling their situation, such as removal from their home, placement in a new home and new school, visits with parents and siblings, and possible return home or another placement.
- Foster parents deal with difficult issues in the foster child's background and are comfortable talking with children about their experiences and their families.
- Foster parents model healthy relationships with spouses/romantic partners, family, and peers and help children form safe and secure adult and peer relationships.
- Foster parents model empathy. They create an environment in which children feel safe to express their emotions and help children experience and regulate them.

**Parental Resilience**

- Foster parents simultaneously manage normal everyday stressors while also managing stressful situations associated with the placement of a child, such as the temporary nature of the placement, the integration of a child in crisis into the family, and the potential return of the child to their family or move to another placement.
- Foster parents manage their physical and mental health, including using prescription medication as prescribed and engaging in responsible use of alcohol, tobacco, and marijuana, so that their use does not negatively affect their caregiving capacity or children in their care

**Social Connections**

- Foster parents maintain strong, supportive connections with community and family members and institutions that provide a sense of belonging and emotional support.

- Foster parents have access to and utilize informal supports who can help with the demands and stressors of daily life, including caregiving.

**Concrete Support in Times of Need**

- Foster parents maintain a home that is safe, healthy, adequately clean, and free of hazards.
- Foster parents have adequate, sustainable financial and material resources.
- Foster parents have the knowledge and ability to access appropriate community and professional resources and programs when needed.
- Foster parents effectively ask for help when needed.

| | |
|---|---|
| **Schedule a Home Visit** | 14. The LTSW contacts the prospective foster family within five working days of assignment to introduce themselves and schedule a home visit. The LTSW reminds the prospective foster family that documentation associated with background records checks and medical checks are due within 20 working days. The first home visit should take place within 15 working days of assignment. |
| **Interview/Observe the Family** | 15. The LTSW visits the prospective foster family at least three times. At least two of those visits must occur in the family's home. For prospective foster families with two parents, the LTSW must interview each parent individually at least once and together at least once. For further guidance on interviewing/observing the family, please refer to Appendix A. |

16. **Interview Prospective foster parents:** During home visits, the LTSW engages in conversations with the prospective parent(s) that help them assess their own caregiving capacity and think about their future as a foster parent. These discussions help foster parents understand the different situations they may encounter and the different skills they may need. They help the foster parent think about the role they would play in helping to establish permanency for a foster child by working with the child's clinical team, service providers, parents/family, and pre-adoptive parents when applicable. Throughout the interviews, the LTSW and prospective foster parents discuss their:

- history, trauma history, cultural beliefs, and motivation and how these impact parenting style and skills;
- expectations of and understanding of a foster family's role and responsibilities;
- mental health history, substance/alcohol use, and relationship history and how each could affect their caregiving ability;
- parenting experience and attitude towards parenting;
- understanding of and use of the protective factors to strengthen families; and
- understanding of the concepts they are learning about in training.

17. The LTSW and prospective foster parents discuss the characteristics of children in DCF care and custody. They discuss DCF's approach to concurrent planning and how foster parents help with both reunification and adoption. They discuss what happens after a child's permanency plan changes to adoption: the DCF process, the court process, and legal risk. Through these conversations, the LTSW helps the prospective foster parents understand the social-emotional needs and characteristics of the children they are interested in fostering, which should include an understanding of their willingness and ability to provide care for a foster child whose plan is reunification and their willingness and ability to provide permanency for a foster child whose plan is adoption. The LTSW helps the prospective foster family decide if they primarily want to foster,

foster to adopt, or adopt. The LTSW notes the family's preference in the completed caregiver assessment.

18. The LTSW reviews with the parent(s) the Department's expectations for foster parents that help keep foster children safe and provide a sense of normalcy for them. The Department expects that foster parents will:

- be free of any physical, mental, or emotional illness, which cannot be addressed through reasonable accommodations and in the judgement of the Department would impair their ability to assume and carry out the responsibility of a foster parent;

    o No disability or specific diagnosis in and of itself will disqualify an individual from becoming a foster parent. The fact that an applicant has a disability or diagnosis (such as a mental health diagnosis or substance use disorder diagnosis) does not mean that the applicant cannot provide appropriate and safe foster and adoptive care.

    o Determinations regarding an applicant's caregiving capacity must be based on objective facts, not on stereotypes or generalizations about individuals with disabilities. Additionally, such determinations must take into account the applicant's existing supports, as well as any disability-related accommodations or services the Department could provide to ensure the applicant can fully and equally participate in the Department's foster care program.

- encourage educational success by ensuring that a child in their care will attend school regularly and will be provided the opportunity to participate in education programs and extracurricular activities which meet their needs;

- have reasonable expectations regarding the behavior and potential growth of children living in foster care and if needed will use discipline that is not corporal or degrading;

- help the child maintain their relationship with their families and partner with the child's parents within the parameters set by the Department;

- partner with the Department in implementing the child's Action Plan;

- possess the physical and emotional stability and well-being to assure that a child placed in their care will experience a safe, supportive, and stable family environment that is free from abuse and neglect;

    o Foster parents will not use any illegal substances, abuse alcohol or marijuana by consuming it in excess amounts, or abuse prescription or non-prescription drugs by consuming them in excess amounts.

    o Foster parents and their guests will not smoke, including electronic cigarettes, in the home, in any vehicle used to transport the child, or in the presence of the child in foster care.

- support connections to the child's individual background, identity, community and family of origin;

- use prudent parent standards to promote the physical, mental, and emotional well-being of a child in their care; and

- complete 20 hours of training annually.

19. **Interview/Observe Household Members:** The LTSW ensures that the whole family understands what it means to become a foster family by having conversations with all household members. The LTSW must interview each household member, including children who are verbal, at least once and should consider doing at least one interview with the whole household present. The LTSW engages in conversations that explore the caregiving capacity of household members who will be caregivers. The LTSW encourages each household member to share their feelings about their own caregiving capacity, the caregiving capacity of other household members, the overall functioning of the household, and their feelings and thoughts on becoming a foster family. The LTSW utilizes behavioral interview questions to assist both the foster family and the LTSW in understanding the strengths and needs of the family.

    Every interaction with the family is an opportunity to observe family relationships and dynamics. It is especially important to observe family interactions with household members who are nonverbal or who have limited communication abilities. Since the LTSW cannot interview these household members, the LTSW assesses them based on their interactions with caregivers.

    For further guidance on interviewing/observing household members, please refer to Appendix A.

20. **Run Criminal and Child Welfare History Checks on New Household Members**: The LTSW runs a criminal and child welfare history check on household members age 15 and older (and those younger if concerns exist) for whom the Recruiter did not run a check during application review. The LTSW closes the family's assessment if the check shows a Lifetime Disqualifying Crime, a Five-Year Disqualification, or disqualifying child welfare history. (See: Background Records Check Policy.) The LTSW may close the family's assessment if the results raise safety or clinical concerns and closing is recommended by the LTSW, their supervisor, and manager.

    For other results, the LTSW requests any needed documentation within 20 working days from the identified individuals. The identified individual must provide written consent to share results that raise safety or clinical concerns with foster parent applicants (and other adult household members as appropriate) in order to ensure a transparent and comprehensive assessment. The LTSW closes the prospective foster family's assessment if they refuse.

    Household members age 15 years or older also need to obtain a fingerprint-based check of the national crime database if they have not done so already.

21. **Discuss Criminal and Child Welfare History Results:** The LTSW and adult household members together discuss any criminal or child welfare history, including results from FBI fingerprinting, relevant police responses to the home, and associated documentation. The LTSW and adult household members review any steps the individual has taken to address the reasons for their involvement with the criminal justice and/or child welfare system. The LTSW and the family examine how their history affects their caregiving capacity and works together to mitigate concerns.

    The LTSW can move forward without reviewing police responses if they were never received.

**Assess Non-Household Members**

22. The LTSW and the prospective foster family discuss non-household members that regularly visit the home, as well as the frequency/nature of the visits. As part of this discussion, the LTSW helps the family think about how these individuals may increase or decrease safety in the home and how they help or hinder the family's caregiving capacity. The LTSW and the family develop a shared understanding of how these individuals might positively or negatively affect the safe care and well-being of children. Non-household members who are in the home on a regular basis must not pose a safety risk to children placed in the home or impede or prevent the provision of adequate care.

23. Any non-household member that meets the following criteria must complete an interview and a criminal and child welfare history check:

    - The individual is present at the prospective foster home on a recurring/routine basis; AND

    - The individual has a significant relationship with prospective foster parent(s) and/or household members, the nature of which creates the potential for unsupervised contact with children placed in the foster home. Examples include but are not limited to: non-custodial parents, significant others, relatives, or close friends; OR

    - The individual is present in the prospective foster home for the purpose of serving in a caregiving role (e.g., babysitters).

    In this interview, the LTSW assesses the caregiving capacity of the non-household member using the protective factors framework and takes into account any criminal and/or child welfare history check results. The LTSW may hold the interview in person or via telephone or other electronic medium.

**Assess the Physical Safety of the Home**

24. The LTSW and the prospective foster family together do a thorough review to determine whether the home is a safe physical environment for a foster child. This includes a walk-through of the home, a review of each room, and a discussion about and observation of how the family utilizes the space. The LTSW confirms that there were no changes to the basic housing requirements verified with the family during the Application Review. The LTSW and the prospective foster family together develop a plan to address any safety or capacity issues identified and together review the family's plan for emergencies. For a list of housing requirements for licensing, please refer to Appendix B.

**Contact References and Obtain Medical Statements**

25. The Department requires contact with references to supplement information provided by the family. These references are intended to enhance the LTSW's understanding of the applicant foster parents' ability to provide for the safety, permanency, and well-being of foster children.

    The LTSW talks with the prospective foster parents to identify references who can speak to the prospective foster parents' parenting ability. They discuss why the prospective foster parents chose those individuals as references. The prospective foster parent gives contact information for their references and the LTSW contacts them to assess the prospective foster family's caregiving capacity. The LTSW will call personal references but does not need to call school-based references. If there are no school-based references, the LTSW will call all three personal references provided by the prospective foster parent.

    **Required References:** The Department needs at least three written references from:

- at least two personal references who can speak to the prospective foster parent(s)'s parenting ability, which should include at least:
  - one relative; and
  - one non-relative (e.g., friend, neighbor, colleague, clergy, etc.).
- one school reference for each school age child living in the home and each younger child who participates in a pre-school or child-care program.
  - A third personal reference (either relative or non-relative) is required if there are no children in school, pre-school, or child-care in the home.

**Additional References:** The LTSW should think about contacting people that the prospective foster family identifies as members of their support system and immediate family members, like parents, siblings, and adult children. These are the people who know the prospective foster family best and who can speak to their history and the impact that it has on their motivation to foster and caregiving capacity.

26. The prospective foster family must also provide medical statement(s) for each household member:
- Prospective foster parent(s) must have recent (within the prior 12 months) physical examinations from a licensed health care professional.
- Foster parents and adult household members who will be caring for children 12 months and under must have up to date whooping cough and flu vaccines.
- Flu vaccines are strongly recommended for foster parents and household members, especially for foster homes caring for children 12 months and under, and children with medical needs.
- It is highly recommended that children living in the prospective foster home are up to date on all immunizations, unless the immunization is harmful to the child's health as documented by a licensed health care professional or for kinship placements when it's in the best interest of the child. Immunizations are especially important to consider when children with medically complex needs and/or infants are in the home.
- Household member(s) must disclose current and past mental health and/or substance abuse issues/treatment.

27. The prospective foster family also submits additional documents as needed, such as pet licenses or a license to operate a firearm.

**Provide and Evaluate Training**

28. Prospective foster parent(s) must complete Department approved training. The LTSW documents observations throughout the training and assesses the prospective foster parent(s) after certain sessions. These observations and assessments are used to inform discussion with the prospective foster parent(s). The LTSW also completes a Training Evaluation at the end of the course which describes the parent(s)'s participation in training, evaluates their understanding of the topics, and provides a clinical assessment of their caregiving capacity.

Prospective foster parents keep a reflection log of their thoughts about and reactions to training. The LTSW engages the parent(s) in conversations about their training log entries to explore together their

thoughts and feelings. They use the log to examine together if becoming a foster parent is right for them.

During Training, the LTSW discusses:

- prospective family strengths and how to build on them;
- prospective family needs and how to address them;
- the strengths of children living in foster care and how to build on them;
- the needs of children living in foster care and how to address them;
- the rights, roles, responsibilities, and expectations of/for foster parents;
- laws and regulations and agency structure, purpose, policies, and services; and
- other topics, including but not limited to:
  - first aid, CPR, and how to give medication,
  - the impact of childhood trauma,
  - managing child behaviors,
  - normalcy and prudent parent standards,
  - maintaining meaningful connections between the child and their family/community, and
  - concurrent planning, permanency plans, adoption, and legal risk.

29. Kinship Families also complete Department approved training. Training is given in a format that meets their needs and includes additional content applicable to their situation.

30. When a prospective foster parent(s) delays training, the LTSW engages in conversations with them to determine the cause of the delay. The LTSW helps them strategize how to address any barriers to attending training. The LTSW closes assessment when the prospective foster parent(s) continually delays training, and the Department is not responsible for the delay (i.e., no trainings currently available).

31. When a prospective foster parent(s) has multiple absences or does not attend any training, the LTSW engages in conversations with them to determine the cause of their absence/delay. The LTSW helps them strategize how to address any barriers to attending training, including providing make-up sessions when appropriate. The LTSW closes assessment when the prospective foster parent(s) consistently misses trainings.

**Write the Clinical Assessment and Training and Support Plan**

32. The LTSW writes a clinical formulation that evaluates parent behaviors, knowledge, skills, and attributes. It examines how the parent(s) uses, finds, or develops resources, supports, or coping strategies that allow them to parent effectively. It succinctly identifies what has been learned about parent/caregiver capacity to meet the specific needs for safety, permanency and well-being of children living in foster care. It includes descriptions of each parent/caregiver's childhood, education, work experience, and military experience or legal involvement as applicable and how significant life events impact their caregiving capacity. It details any concerns about substance abuse, mental health, domestic violence, or past involvement with the Department.

33. The LTSW and the prospective foster parent(s) discuss what resources, trainings, and supports the family will need in order to have successful

placements. Together, they create a training and support plan which lists community or other resources the family will access and the ways in which the Department commits to helping them. It also addresses how the prospective foster parent(s) will further develop their knowledge and skills. The LTSW includes the family's training and support plan in the clinical assessment.

**Compile the Caregiver Assessment**

34. The LTSW puts together a Caregiver Assessment which includes but is not limited to:

- the Application;
- criminal and child welfare history check results and documentation, including relevant police responses, if received, and FBI fingerprinting
- list of contacts with the family;
- list of references and documentation;
- summary of information learned in interviews, observations, and contacts with references;
- Training Evaluation;
- a clinical formulation that assesses the family's caregiving capacity;
- the family's support plan; and
- a licensing recommendation, including the physical capacity of the home and any placement recommendations/specialties identified.

The LTSW consults with their Supervisor to ensure that the Caregiver Assessment is complete. The Supervisor reviews the final Caregiver Assessment and sends it to the APM for review. Within five working days of receipt, the APM schedules a Licensing Review Team to occur.

**Put an Assessment On Hold**

35. If the prospective foster family is not able to complete the requirements (e.g., references, fingerprinting, housing requirements) within the given timeframes and the Department is not responsible for the delay (e.g., training not available), then the LTSW puts the family's assessment on hold. The LTSW notifies the prospective foster family, in writing, if their assessment is put on hold and the reason(s) for the hold. The family has 20 working days in which to resolve these reason(s), but they can reach out to the LTSW as soon as they are ready to proceed. The LTSW contacts the family if they have not heard from them at the end of the Hold period. The LTSW closes their assessment if the family has not resolved the reason(s) for the Hold by the end of the Hold period.

**Close an Assessment**

36. The LTSW closes a family's assessment at their request or due to:

- a criminal and child welfare history check result that shows a lifetime or five-year disqualification;
- a household member who doesn't agree to disclose criminal and child welfare history check results;
- safety or clinical concerns when the LTSW, their supervisor, and APM recommend to close;
- missing housing requirements;
- a failure to register for training when there are trainings available or repeated training absences; or
- a failure to resolve reason(s) for a Hold within 20 working days.

The LTSW documents the reason(s) for closure.

The LTSW notifies the prospective foster family in writing that their assessment has been closed. The prospective foster family has the right

to request a Fair Hearing if they disagree with the Department's decision to close their assessment. The prospective foster family has the right to request a Grievance if the reason for closure was a disqualifying criminal history.

**Re-Open a Closed Assessment**

37. The prospective foster family can contact the Department and request to re-open their assessment within six months if they voluntarily closed their assessment or if they were closed because they did not resolve the reason(s) for a Hold within the given timeframe.

- The LTSW must review the housing requirements if the prospective foster family's address has changed.
- The LTSW must run new criminal and child welfare history checks if the last check is 12 months old or older.

38. After six months, the prospective foster family must submit a new application.

## G. PROCEDURES: LICENSING REVIEW TEAM

Licensing Review Teams (LRT) are meetings that occur regularly in order to provide an objective review of all prospective foster families. The LRT examines information gathered during Recruitment, Application Review, and Caregiver Training and Assessment to form an understanding of the family. The LRT discusses the family's skills, knowledge, and capacity to provide a physically and emotionally safe environment for foster children. The LRT reviews the licensing recommendation and training and support plan and modifies either as needed. Attendees include the following, as well as additional members when criminal or child welfare history requires higher approval:

| For Foster Homes | For Kinship Homes | For Kinship Cross Regional/Cross Office |
|---|---|---|
| LTSW | LTSW | LTSW |
| LT Supervisor | LT Supervisor | LT Supervisor |
| Regional Program Manager | Regional Program Manager | Regional Program Manager |
| FFSW Supervisor receiving the home | KSW assigned to the home | KSW assigned to the home |
| Ongoing Supervisor or Manager from the AO where the home is | Ongoing SW or Sup assigned to the home | Ongoing SW or Sup assigned to the home |
| Regional QA Supervisor or Regional Manager facilitates | Regional QA Supervisor or Regional Manager facilitates | Regional QA Supervisor or Regional Manager facilitates |

**Prepare for an LRT**

1. Prior to the LRT convening, attendees review the prospective foster family's completed Caregiver Assessment to understand their behaviors, knowledge, skills, and caregiving capacity. This includes any information and documentation provided about criminal or child welfare history, current or prior substance misuse, current or prior behavioral health, domestic violence, and other significant life events or past trauma(s) that might impact caregiving capacity.

**Convene an LRT**

2. LRTs are a valuable opportunity to participate in shared decision making and planning for a prospective family. Participation in person is encouraged; however, members can participate through telephone or

video conferencing, if necessary.  If both the LTSW and their supervisor are unable to attend, the panel is rescheduled.

The LRT covers the following:

**Understanding the Family:** The LTSW and their supervisor present the prospective foster family, including their impressions of the family, the family's strengths, any identified needs, their recommendations for placements, and the training and support plan. Attendees ask questions to clarify and expand upon information reviewed and presented. The panel considers the prospective family's caregiving capacity within the context of the Protective Factors.

The panel spends time discussing unique considerations for the foster family if they intend to provide specialized care beyond foster care. For families who intend to be kinship families for a particular child, the panel considers how the family can meet the specific safety, permanency, and well-being needs of that child. For families who intend to provide a higher level of care, the panel considers their skills and experiences and how that will allow them to care for children with additional medical and behavioral health needs. For families who intend to adopt children placed in their home, the panel considers the family's ability to help facilitate concurrent planning for the child, to work with the child's family/community of origin to further the child's well-being, and to handle the uncertainty of legal risk.

**Review Approvals:** If approvals are needed related to criminal and child welfare history check results or the physical safety of the home, they are discussed and resolved.

**Plan for Follow-up:** At the conclusion of the meeting, the LRT makes a decision to approve or deny the prospective foster family or to defer decision making until additional information can be obtained. If the LRT needs to defer decision making because additional information is needed, the LTSW has up to 10 working days to gather additional information and submit to the facilitating manager for review.

The LRT can also make modifications to the prospective foster family's placement recommendations or their training and support plan. The manager facilitating the panel documents the decisions made and any follow up items and responsibilities.

**Obtain Additional Approvals, if needed**

3.  Ideally, the approver will attend the LRT. If needed, the facilitator will forward the Caregiver Assessment for approval. The review occurs within five working days.

**Notify the Family and Assign the Home**

4.  The LTSW contacts the family (and informs them in writing) of the licensing decision within ten working days of making the decision. The LTSW informs the family about next steps, including notifying them of their assigned FFSW when applicable. If a denial decision was made, the LTSW also notifies the family (and in writing) of their right to request a Fair Hearing.

The FFSW Supervisor receives and reviews the foster family's Caregiver Assessment and assign them to a FFSW. For kinship foster families, the KSW and their Supervisor should both review the completed Caregiver Assessment and should contact the LTSW or their Supervisor with follow-up questions as needed

## H. PROCEDURES: POST-LICENSING ASSESSMENTS

The Caregiver Assessment is intended to be a living document that is updated periodically. Circumstances change and the Department and the foster family together must re-evaluate caregiving capacity. Post-licensing assessments provide an opportunity to check in with the foster family to see how everything is going, to engage in joint problem solving, and to help the foster family access the services and supports they need in order to feel successful and provide quality care.

During annual assessments, the LTSW and the foster parents review placements in the previous year and related successes and challenges. They discuss any changes from the last update to the Caregiver Assessment and the potential impact(s) of those changes on caregiving capacity. Together they assess the foster family's continued ability and willingness to meet the needs of foster children. They determine what services, supports. and/or trainings the foster parents need in order to continue providing quality foster care and the LTSW helps connect the foster parent(s) to those resources.

Additionally, the Department is required to conduct interim assessments whenever there are allegations of abuse or neglect filed against a foster family household member OR when the Department identifies safety or clinical concerns that may affect the ability of the foster family to protect any child placed in their home. During the interim assessment, the Department focuses on gaining an understanding of the underlying issues that led to the incident that triggered the need for the interim assessment. The Department may conduct any activities deemed necessary to assess the family's ongoing capacity to meet the safety and well-being needs of the foster children placed in their home. When needed, the Department identifies specific interventions and/or supports to improve placement stability.

Like during the initial assessment, annual and interim assessments emphasize shared decision-making and problem-solving and assess the foster parents' understanding of and use of the protective factors that strengthen families. At the end of an annual or interim assessment, foster parents indicate that they wish to continue in their role, and the Department determines if the licensing standards continue to be met.

The Department also completes an assessment when a foster family wishes to adopt a child in DCF care. The assessment is an addendum to the family's Caregiver Assessment, which focuses on their ability to meet the specific safety, permanency, and well-being needs of the child they would like to adopt.

**Annual Assessments**

5. Annual Assessments are due 12 months after initial licensing or from the date that the previous annual assessment was approved. Annual assessments begin 60 working days before they are due. The Supervisor assigns a LTSW within three working days of the beginning of the annual assessment. The LTSW contacts the family to remind them of the upcoming assessment within five working days of assignment. When an annual assessment is due while a foster home is inactive, the annual assessment is completed if and when the home is reactivated.
For the annual assessment, the foster parents need to:
   - collect a medical statement for all household members; and
   - obtain a fingerprint-based check of the national crime data base every two years.

The foster family is responsible for scheduling appointments to meet these requirements and providing documentation to the Department as needed.

6. **Schedule a Home Visit:** 60 working days before an annual assessment is due, a LTSW is assigned. The LTSW contacts the family within five working days of assignment and visits the home within 15 working days of assignment, ensuring the foster family has sufficient time to resolve any issues that would otherwise cause their home to be closed.

7. **Gather Information from DCF Sources:** Prior to the home visit, the LTSW runs a CORI, SORI, and DCF History Check on all household members age 15 and older (and those younger if concerns exist). The

LTSW receives and reviews information from each child's Social Worker who had a child in the home in the past year and from the FFSW. This information details the ways in which the foster family supported the work of the Department and a summary of strengths and challenges. The LTSW also reviews applicable documentation from the previous year (last annual assessment, interim assessments, materials from Foster Care Reviews, etc.). The LTSW follows up with internal sources for further information as needed.

8. **Visit the Home:** The LTSW visits the home and confirms that the home continues to meet the housing requirements. The LTSW and the foster parents check in to see how everything is going. Together they discuss:

   - any significant events or changes in the last year, including how they impacted caregiving ability, if applicable;

   - experiences living with foster/pre-adoptive child(ren) in the past year;

   - identified strengths and challenges;

   - what trainings, services, and supports were helpful in the past year; and

   - what trainings, services, and supports the foster family needs to feel successful in the upcoming year.

   The LTSW also meets with the other household members to check in to see how everything is going.

9. **Review Non-Household Members:** The LTSW and the foster parents review the list of non-household members approved to visit the home. They update the list to reflect new non-household members and to close out former non-household members. Non-household members who remain on the list need a criminal and child welfare history check as part of the family's annual assessment. New non-household members who meet the definition laid out in Caregiver Training and Assessment need both a criminal and child welfare history check and an interview with the LTSW.

10. **Gather information from Non-DCF Sources:** The LTSW contacts those references identified as necessary in consultation with their Supervisor to discuss the caregiving capacity of the foster parents. The LTSW asks the foster parents for references' contact information as needed.

    The LTSW requests police responses to the home since initial licensing or since the last annual assessment. The LTSW can move forward without reviewing police responses if they were never received.

11. **Write the Annual Assessment:** The LTSW uses all the information gathered to write the annual update to the Caregiver Assessment. The LTSW writes a clinical formulation that evaluates the foster parents' ongoing ability to fulfill the requirements of a foster parent and meet the needs of foster children through their knowledge of and use of the protective factors. In developing the clinical formulation, the LTSW evaluates all the information gathered during the annual assessment in the context of any previously identified safety or clinical concerns. The assessment summarizes the foster parent's self-identified strengths and needs, including how they use, find, or develop resources, supports, or coping strategies that allow them to parent effectively. It also details any new safety or clinical concerns, their impact on caregiving capacity and how the family has addressed the concerns. The LTSW summarizes the training and support plan for the upcoming year developed in collaboration with the foster parent.

12. **Make a Recommendation:** The LTSW and their supervisor meet to discuss the foster home. Together they recommend whether or not to continue licensing and update the recommendation for placements as needed. The APM has five working days to review and approve the annual assessment and recommendation or ask for additional information. The LTSW has 10 working days to provide additional information. If approval is needed due to a criminal or child welfare history identified in the home, the assessment and recommendation is approved by the manager designated in the Background Records Check Policy.

13. **Required Notifications:** The LTSW notifies the FFSW and their supervisor of the outcome of the annual assessment. The FFSW reviews the assessment and contacts the LTSW to discuss any concerns as needed. In addition, the LTSW notifies the foster parent(s) in writing of the outcome of the annual assessment. If the outcome results in the recommendation to close the home, refer to the requirements for closing a home below.

**Interim Assessments**

14. Interim assessments are completed as a result of events and incidents that impact child safety. Interim assessments are required to be completed when:

- allegations of abuse or neglect are filed against any household member of a family foster home; or

- safety or clinical concerns are identified that may affect the ability of the foster family to protect any child placed in their home.

Interim assessments need to be addressed and resolved quickly. Therefore, the LTSW Supervisor assigns the LTSW to the interim assessment immediately. The written interim assessment must be written, reviewed by the supervisor and submitted to the APM within 15 working days of assignment.  The LTSW can request an extension of five working days when there is a barrier to completing an interim assessment (e.g., awaiting information from SIU). Their supervisor, in consultation with their manager, approves the extension.

15. If an incident requiring an interim assessment occurs during an open annual assessment, the interim assessment activities are added to, and completed with the annual assessment activities. The interim assessment incident does not require a separate assessment of the foster family home.

16. **Cross Unit Team Collaboration and Involvement in Screening Team (if applicable).**  Whenever an incident requiring an Interim Assessment of a foster family home is identified, a Cross-Unit Team, comprised of staff who have information needed to make decisions about safety and risk is convened. This team shall include representatives from each child's clinical team, the FFSW/KSW and their Supervisor, a representative from the Licensing and Training unit, a representative from SIU if applicable, and AD/Designee. These individuals meet immediately, in person if possible and by phone if needed, to share information about the foster home and coordinate a response. They discuss:

- a timeline for response, including whether an immediate response is needed;

- the coordination of activities across units;

- what information to communicate to the foster parent that does not put children in the home at risk or compromises the integrity of the interim assessment;

- any safety plans, services, and/or supports needed to stabilize the foster home and promote safety for the children in the home; and
- whether to suspend additional placements during the interim assessment.

In addition, when the situation involves a 51A, the Area Office Screening Team Meeting must include the Cross Unit team in its review of the allegations of abuse or neglect. Together they discuss:

- whether to recommend screening in the report;

- if screened in, whether the report constitutes an emergency;

- whether the emergency removal of the child(ren) is warranted;

- if there should be a joint visit with the LTSW and Response Worker;

- if a home visit by the LTSW is not recommended, based on the severity of the allegation and/or safety concerns raised by the nature of the incident;

- if screened out, why an interim assessment would not be appropriate; and

- what information to communicate to the foster parent that does not put children in the home at risk or compromise the integrity of the Department's and/or law enforcement's investigation.

17. **Support to Foster Family During Interim Assessments.** Unless indicated differently by the Cross-Unit team, the FFSW contacts the foster parents immediately to share information established by the Cross-Unit team. At this time, the FFSW and the foster parents make a plan for continued communication to provide the foster parents with the ongoing support they will need throughout the Interim Assessment. At a minimum, the FFSW keeps the family informed about progress of the assessment and helps explain next steps in the process. Communication with the foster parents should focus on better understanding the circumstances leading up to the incident, as well as any services or supports that may be needed to support the foster parents and to promote placement stability. The FFSW and foster family continue to modify plans for safety and support throughout the interim assessment.

18. **Complete Interim Assessment Activities:** Following the Cross-Unit team meeting, the LTSW contacts the foster family and schedules a home visit as soon as possible, but no later than five working days from date of assignment. The meeting can occur earlier if the Cross-Unit team determines that a joint visit by the LTSW and the Response Worker is recommended. The FFSW may participate in this joint meeting, if they are available. Prior to the home visit, the LTSW will review relevant information and documentation about the foster family (e.g., previous annual assessment, 51A). At the home visit, the LTSW and the foster parents discuss the reason(s) for the interim assessment and how it impacts caregiving capacity and safety and risk in the home. The LTSW and the foster parents also discuss what services or supports the LTSW can put in place to help the foster parents continue to provide quality care.

The LTSW and their supervisor determine what other activities need to be completed in order to form a comprehensive understanding of safety and risk and/or caregiving capacity in the foster home. These activities could include but are not limited to:

- interviewing other household members,

- running criminal and child welfare history checks;

- checking the home for the physical requirements;

- convening a clinical review team to fully assess safety and risk in the foster home; and

- contacting references provided by the foster family.

The AD/designee may choose to remove any child in the care of the foster parent(s) at any time during the interim assessment if the child's physical, mental, or emotional well-being would be endangered by them remaining in the foster home. (See Safe and Supported Placements Policy)

19. **Cross Unit Collaboration in the Interim Assessment and Response:** The members of the Cross Unit Team support each other throughout the interim assessment and if applicable, the 51B response. Observations and evaluations of the foster family and their interactions with foster/pre-adoptive children from the child's clinical team and the foster family's FFSW/KSW are critical data points that the LTSW needs in order to make an informed decision about the on-going caregiving capacity in the foster home. In addition, the observations and evaluations of the foster family by the child's clinical team, the FFSW/KSW, and the LTSW may be critical to the work of SIU in determining whether an allegation of abuse or neglect should be supported.

20. **Cross Unit Team Involvement at Response Conclusion:** When the SIU Worker reaches a conclusion, the Cross Unit team shall reconvene to share the findings and how the findings may impact the Cross Unit work of the Department. These individuals meet in person if possible, and by phone if needed, to share information about the foster home and coordinate a plan for next steps. The purpose of the meeting is to share:

- experiences from all team members related to interactions with and observations of the foster family during the process;

- rationale for the response decision; and

- what safety plans, services, and/or supports could be implemented to assist in stabilizing the placement and to promote safety for children in the home.

If the SIU Worker determines that a foster parent is responsible for the abuse and/or neglect of any foster/pre-adoptive child in their care, the foster home must be immediately closed to future placements. In limited circumstances, the AD/Designee may approve foster/pre-adoptive children remaining in the home if the child's clinical team believes that remaining in the home is in the child's best interest.

21. **Write the Interim Assessment:** The LTSW uses all information gathered in interviews with household members, references, and other Department staff to write a clinical assessment of safety and risk and/or caregiving capacity in the foster home. The LTSW details any impact on caregiving capacity and any further safety or clinical concerns. The LTSW records the foster family's plan for additional training and support to mitigate the reason(s) for the interim assessment. If applicable, the LTSW and the foster parent(s) agree on a due date by when the foster family needs to complete any related resolution activities. The FFSW, in consultation with the LTSW, follows up with the foster family to check that they have completed any necessary activities.

22. **Make a Recommendation:** The LTSW and their supervisor meet to discuss the interim assessment. Together they make a recommendation whether or not to continue licensing and update the foster family's placement recommendation as needed. The APM has five working days in which to review and approve the recommendation or ask for additional information. If additional information is needed, the LTSW has ten working days in which to provide the additional information.

23. **Required Notifications:** The LTSW notifies the FFSW and their supervisor of the outcome of the interim assessment. The FFSW reviews the assessment and contacts the LTSW to discuss any concerns as needed. In addition, the LTSW notifies the foster parent(s) in writing of the outcome of the interim assessment. If the outcome results in the recommendation to close the home, refer to the requirements for closing a home below.

**Assessment When a Foster Family is Adopting**

24. Permanency Assessments evaluate a family's capacity to meet the safety, permanency, and well-being needs of a specific child. The family's FFSW contacts the LTSW Supervisor to inform them that the family wishes to proceed with an adoption, and the LTSW Supervisor assigns a LTSW within three working days. The LTSW has 60 working days to complete the Permanency Assessment. The LTSW uses information from DCF sources and interviews with and observations of the family to understand the family's relationship with the child, the child's relationship with the family, and the family's capacity to meet the child's needs now and in the future.

25. **Schedule a Home Visit:** Within five days of assignment, the LTSW calls the family to introduce themselves and schedule a home visit. One home visit is required but the LTSW may need to visit the family's home more than once to complete the assessment activities.

26. **Gather Information:** The LTSW reviews the family's Caregiver Assessment and any other assessments in order to get to know them. They also contact the family's FFSW and the child's social worker to discuss both the family and the child. The LTSW inquires why both think that this family is a good match for the child.

    The LTSW may also contact other staff who have worked with the family or the child or their family, DCF specialists, and collaterals to gain further information. The LTSW may also refer the family to a bonding/attachment evaluation when concerns exist.

27. **Visit the Home:** During the home visit, the LTSW interviews each household member, including the adoptive child, according to their age, development, and role. The LTSW also observes family functioning and family interactions to evaluate the relationships between family members and the adoptive child. The LTSW must observe the whole family together at least once. The LTSW schedules their visit to coincide with the adoptive child's visits to the home if the adoptive child is not yet living in the home full-time.

    In the interviews, the LTSW and the parents mutually explore the family's ability and willingness to make a long-term commitment to the child and together determine the family's ability and willingness to meet the child's current and future needs. They must cover the following five topics in their conversations and should cover other topics as needed:

    - the family's relationship with the child including but not limited to:
        - nature/duration,

- - their experiences with parenting the child, disciplining the child, procuring and attending services for the child, and providing normalcy for the child,
  - their understanding of the child's experiences, the child's reactions to their experiences, and how they as a family have helped the child process, grieve, and begin to heal from trauma
  - their expectations of the child as a family member;
- the family's relationship with the child's birth family including but not limited to:
  - their understanding of why the child entered care and their history of working with the child's birth family,
  - their ability and willingness to maintain connection with the child's birth parents, siblings, and extended family,
  - their ability and willingness to pursue an open adoption, including specifics about what degree of contact they would be comfortable with,
  - their ability and willingness to engage in permanency mediation;
- the family's understanding of and capacity to meet the child's current and future physical, mental, emotional, and well-being needs including how they plan to meet the following needs:
  - permanency (sense of belonging),
  - medical/behavioral health,
  - educational,
  - normal childhood experiences,
  - connection to their family, community, culture, and religion of origin,
  - connection to LGBTQIA+ community when applicable, and
  - their comfort and competence in parenting a child from a different racial or ethnic background when applicable, including how they plan to honor and integrate the child's racial, ethnic, linguistic, cultural, and religious background into the child's life;
- the family's commitment to the child; and
- the family's understanding of, attitudes toward, and experiences with adoption, including a conversation about how members of the family's extended family, support system, and community feel about the family's plan to adopt the child.

28. **Write the Assessment:** The LTSW uses all of the information gathered to write the Permanency Assessment. The LTSW writes a clinical formulation that evaluates the foster parents' capacity to meet the child's current and future needs. The assessment summarizes foster parent strengths and needs and how the Department can assist the family in meeting their needs through services and support.

29. **Make a Recommendation:** The LTSW sends the Permanency Assessment to their supervisor for review. The Supervisor has five working days in which to review and ask for additional information. The LTSW has 10 working days in which to provide additional information when needed.

**Reporting Changes in a Foster/Pre-Adoptive Home**

30. The FFSW and the foster/pre-adoptive family maintain open communication regarding changes in the foster family or home that impact licensing requirements. The foster/pre-adoptive parents are required to notify their FFSW, as soon as possible when any of the following changes take place:

- new criminal and/or child welfare history for any household member or non-household member that is part of the existing Caregiver Assessment;
- police response to the foster home;
- decision to change their type of license (e.g., from unrelated to kinship or from kinship to unrelated);
- intent to move to a new residence;
- new household member;
- new non-household member visiting the foster home regularly; and
- changes impacting the housing requirements.

**Assess Changes and Update the Family's Record:** Based on the type of change reported by the foster parent(s) or identified by the Department, the FFSW or LTSW will complete the necessary activities to update the Caregiver Assessment. In consultation with their Supervisor, the Support Unit, and Licensing and Training Unit, changes that have impact on child safety are immediately assessed, addressed, and resolved by either the FFSW or the LTSW.  For all other changes, the FFSW contacts the foster family within three working days to gather additional information, complete any associated activities, and updates information in the foster family's record and/or Caregiver Assessment. The FFSW and the foster parents together identify any new training or supports needed and discuss how to keep children in the home safe if applicable

The Licensing and Training Unit reviews the changes and based on the type of change reported by the foster parent(s) or identified by the Department, the LTSW Supervisor determines if additional activities are needed. The LTSW Supervisor reviews the updates to the foster family's record and/or Caregiver Assessment and approves the update.

**Determine Whether an Interim Assessment is Needed:** The Licensing and Training Supervisor is notified of all changes in the foster family or home and will decide if an interim assessment is needed.

**Closing a Foster Home**

31. When the decision is to close a foster home after an annual or interim assessment, the FFSW and LTSW coordinate the appropriate manner to contact and inform the foster family of their decision to close their home and notify them, including in writing, of any applicable Fair Hearing rights. The FFSW or their Supervisor contacts the social workers of any children living in the home to plan for transition. Foster children living in the home must be moved within 10 working days of the decision to close a foster home. The AD/Designee may approve an extension of 10 working days to

allow for a slower transition for foster children when the child's clinical team determines that a slower transition is in the best interest of the child.

When there is disagreement between a hosting and placing office regarding the decision to close a foster home, an RCRT is convened that involves staff from both offices, within 10 working days to resolve the disagreement.

In limited circumstances, the AD/Designee may approve foster children remaining in the home if the child's clinical team believes that remaining in the home is in the child's best interest.

32. The foster parents can request to close their home at any time and must submit a request in writing. The FFSW contacts the foster parents within five working days to confirm their intent to close. This is done in person if possible.  Together they discuss their reason(s) for closing and create a plan to increase services and supports if appropriate. They also discuss the possibility of going inactive. (See Safe and Supported Placements Policy.) The FFSW informs the foster parents about opportunities to stay involved as foster parents who don't provide full-time care (e.g., hotline home, respite) or to stay involved as a volunteer with the Department (e.g., foster care review volunteers).

If the foster parent(s) still wish to close, the Department and the foster parents plan how and when to transition any foster children living in the home. The Department informs the child's social workers of the plan.

**Re-Open a Home**

33. A foster family who closed their home voluntarily may submit a written request to re-open their home within six months of closing. The Department can re-open their home after checking that they and their home continue to meet the standards for licensing by doing an annual assessment. The LTSW completes this assessment. The foster family must submit a new application if they closed their home more than six months ago.

Former foster families whose home was closed by the Department must submit a new application if they wish to re-open their home.

**APPENDIX A. GUIDES: Caregiver Training & Assessment, Annual Assessment, Interim Assessment, Permanency Assessment**

The purpose of a caregiver assessment is for the LTSW and the prospective foster parent(s) to mutually determine the capacity and readiness of the family to provide safe and appropriate care for a child living in foster care. This is done by determining and building on prospective foster parent(s)'s understanding of and use of the protective factors that strengthen families. Foster parents are committed to offering supportive and loving environments for children. Prospective foster parents show that they are capable of maintaining such an environment by demonstrating certain qualities within the Strengthening Families Protective Factors Framework that protect children and minimize risk. The protective factors contain the skills, knowledge, attributes, and abilities of caregivers that allow them to provide for the safety, permanency, and well-being of children. The Foster Parent Standards contained within the protective factors framework are:

**Knowledge of Parenting and Child Development**

- Foster parents understand childhood development, recognizing that each child has different safety and well-being needs based on their age and development.
- Foster parents understand that children living in foster care have trauma histories that can affect their behavior and development. Foster parents use positive discipline methods that are consistent with a child's age, development and trauma history.
- Foster parents value education and commit to helping children living in foster care attain educational success.
- Foster parents know the warning signs of trafficking, exploitation, and teen dating violence and talk with children about personal safety in developmentally appropriate ways.

**Building Social and Emotional Competence of Children**

- Foster parents understand that nurturing and attachment are important for healthy brain development and know how to develop a nurturing and responsive relationship with children.
- Foster parents assist foster children in handling their situation, such as removal from their home, placement in a new home and new school, visits with parents and siblings, and possible return home or other placement.
- Foster parents deal with difficult issues in the foster child's background and are comfortable talking with children about their experiences and their families.
- Foster parents model healthy relationships with spouses/romantic partners, family, and peers and help children form safe and secure adult and peer relationships.
- Foster parents model empathy. They create an environment in which children feel safe to express their emotions and help children experience and regulate them.

**Parental Resilience**

- Foster parents simultaneously manage normal everyday stressors while also managing stressful situations associated with the placement of a child, such as the temporary nature of the placement, the integration of a child in crisis into the family, and the potential return of the child to their family.
- Foster parents manage their physical and mental health, including using prescription medication as prescribed and engaging in responsible use of alcohol, tobacco, and marijuana, so that their use does not negatively affect their caregiving capacity.

**Social Connections**

- Foster parents maintain strong, supportive connections with community and family members and institutions that provide a sense of belonging and emotional support.
- Foster parents have access to and utilize informal supports who can help with the demands and stressors of daily life, including caregiving.

**Concrete Support in Times of Need**

- Foster parents maintain a home that is safe, healthy, adequately clean, and free of hazards.

---

- Foster parents have adequate, sustainable financial and material resources.
- Foster parents have the knowledge and ability to access appropriate community and professional resources and programs when needed.
- Foster parents effectively ask for help when needed.

## I. **COMPLETING THE CAREGIVER ASSESSMENT**

Prior to visiting the home, the LTSW reviews the family's application to learn important information about the family including but not limited to:

- home address and any important information about the home location (e.g., a gated community, dead end street, etc.);
- family composition, including names/preferred names and ages of all household members;
- names and types of pets;
- date of initial meeting, date of initial application, and length of time in the licensing process so far;
- how the foster parent(s) presented during Application Review;
- any household norms/expectations for visitors; and
- any household rules and expectations to be verified with the family (e.g., removing shoes on rug covered areas; no eating meals/snacks in bedroom spaces; screen time limits during the school week).

The LTSW uses the following discussion topics to evaluate and summarize family functioning. The LTSW uses the knowledge gained to explore further topics of conversation with other household members, non-household members, and references. The LTSW collects all of this information and adds it to their observations and assessment of other factors to evaluate the applicant foster parent's knowledge of and use of the protective factors.

The sample questions are offered as suggested guidelines. Of course, interview questions will need to be tailored to the families being interviewed, and follow-up questions will need to be formulated based on responses from the family members. These questions are intended to give the LTSW a starting point as they gather data and guide the family through a process of self-assessment.

1. **Self-Identity -** The LTSW gives the applicant an opportunity to give a brief summary of who they are as an individual.
   o How would you describe yourself/your personality to someone else?
   o What are your best traits?
   o What areas do you think you could improve on?

2. **Family Background -** The applicant's family of origin, how they were brought up and their relationships with their family members.
   o Where did you grow up/spend your childhood (city, town, state, country)?
   o Who raised you? Who is in your extended family?
   o Who are your siblings? Describe your relationship with them.
   o Describe your family's values in terms of work ethics, education, and community support.
   o What are your relationships with family now?

3. **Interpersonal Relationships -** The applicant's ability to develop, maintain, and sustain healthy relationships. In a two-parent home, the relationship of the applicants must be strong enough to withstand the demands of parenting.
   o How, when and where did you meet your spouse/partner? How long have you been together? What drew you to each other? Describe the best things about your relationship with your spouse/partner? Describe some of the challenges in your relationship with your spouse/partner?
   o How do you and your spouse/partner manage and resolve disputes?

- How do you demonstrate affection in your family? How do you know that other family members care for you? How do they show it?
- Thinking about extended family members and close friends, with whom are you closest, with whom do you have serious conflict and why? How often do you see that individual?
- How do you perceive personal support? Who do you rely on for support when you need it and why/how has this person been supportive to you in the past?
- Describe past relationships that ended? When and how was the relationship ended, including who ended the relationship?

4. **Personal and Emotional Maturity -** The applicant's ability to put another's needs before their own without feeling personally threatened or experiencing emotional stress.
   - Have you worked toward a goal for a long time? What was the goal and what was the outcome? If you have stopped pursuit of that goal, explain why.
   - Describe a frustrating or disappointing experience you have encountered. How did you respond and what was the outcome?
   - How do you manage your own feeling of anger? How do you manage the angry feelings of others?
   - Describe a time when you have felt personally rejected. What was your response to the rejection and what was the outcome?
   - In what ways do you feel appreciated at home and/or in the workplace? Please give examples.

5. **Coping Skills and History of Stress Management -** The applicant's ability to function in stressful situations. Foster/pre-adoptive parents should have a variety of effective strategies to cope with the changes and stresses inherent in the adoption or foster care process. They should also possess the ability to acknowledge the impact trauma has on their life, recognize when they have been triggered, and use coping skills to effectively manage the resulting emotions.
   - Describe the most challenging situation you have had to deal with as a young person or in your adulthood and/or as a couple? How did you handle the situation and how did it affect you/your family?
   - Have you experienced the loss of a loved one, and if yes, how have you coped with that loss?
   - In the last five years, what changes have you experienced personally or as a family? How did you navigate through them? What strategies were most helpful to use in general for self-care?
   - How do you know when you are getting stressed out? What are the physical, emotional, social or cognitive cues for you? What are situations that are likely to generate stress for you or trigger a crisis?
   - When you are having a difficult time, what resources do you call on to cope?
   - What challenges have you experienced or learned about from other caregivers that cause anxiety for you? What strategies for self-care are effective or ineffective for you?
   - What encounters have you had in caring for children who have experienced trauma?

6. **Flexibility -** The applicant's ability to be flexible in response to challenges from within and outside the family system. Flexibility is also indicated by the family's receptiveness to community and professional services, if needed.
   - How do you/would you facilitate and support lifelong connections between children and important people in their past? Explain. Why do you think lifelong connections are crucial considerations for children? How do you intend to address the need for lifelong connections of children who enter your home?
   - What experience has your extended family had in relating to children who are not biologically related to the family? Can you give some examples? What challenges do you anticipate they may have in integrating foster or adopted children into the family with other biological nieces, nephews, or cousins?
   - In your family, how have you handled differing viewpoints around personal values, religion, politics, lifestyles, etc.?

7. **Ability to Empathize with Others -** The applicant's ability to relate to and understand another person's situation, feelings, and motives. This is particularly important when parenting children who come from backgrounds of abuse or neglect.
   - How can you tell when people in your family are upset? Angry? Sad? Happy?
   - Why do you think parents abuse or neglect their children? How do you think the parent(s) feel?
   - How would you explain the parents' behavior to the child? How do you think children feel about their parents who have abused and/or neglected them?
   - Tell me about a time when someone understood how you were feeling. Have you ever been able to provide that kind of support to someone else? When? How did you help?

8. **Attitudes and Beliefs Regarding Foster Care and Adoption -** The applicant's ability to view themselves as a resource family for children who enter their home and as team members rather than consumers of services. They are strong child advocates and support the child protection goals of safety, permanency, and well-being.
   - Describe your role and responsibilities in achieving the goals of child protection. Can you explain the difference between foster care, kinship care, and adoption?
   - Please  identify the members of the child protection team and their role in serving children. What do you consider to be some advantages and disadvantages of teaming with child protection professionals?
   - How do you define permanency? Why do you think permanency is defined as one of the goals of child protection? How do you intend to address the permanency needs of children who enter your home?
   - Describe a time when you had to give up something, or be separated from someone, that was important to you. What coping strategies did you use to manage your feelings about the separation/loss?
   - How do you understand your role in promoting the reunification between the child(ren) and their biological family?

9. **Motivation to Foster or Adopt -** The applicant's ability to understand appropriate reasons for adoption and foster caregiving.
   o Why do you want to be a foster parent?
   o What is motivating you to adopt or foster? Why now? What influences have others had on this decision (e.g., friends, family members who are foster caregivers)? Explain your response.
   o What level of support do you expect to receive from your extended family or friends in your decision to foster or adopt a child? Explain your response.
   o What are things that "worry" you about parenting a child not born to you?
   o Have you or your spouse/partner had any infertility/miscarriage issues?  How have you dealt with these issues of infertility/miscarriage?
   o Describe a time when you entered into something and when your expectations were not met. What was the situation? What was your response and what was the outcome?
   o Describe the best outcome for you and your family in this foster/adoption process, and the least desirable outcome for you and your family in the foster/adoption process.
   o If after fostering a child(ren) would you consider adopting?

10. **Parenting Skills and Abilities -** The applicant's ability to care for children and provide the necessary nurturing, discipline, and guidance appropriate for the age and development of the child. Although applicants with children have experience in parenting, caring for a child from the child protection system can present additional challenges.
   o Describe your parenting style. What works for you? In what way have you made changes over time?
   o What do you most enjoy about parenting? What do you dislike?
   o How does parenting fit into your day-to-day life? How might it interfere with other activities you also enjoy doing?
   o Tell me about your children. How are they alike? How are they different? Do you parent them differently? How? Why?
   o Describe some of the different ways adverse experiences and trauma impact a child (emotionally, behaviorally, and socially). What are some of the ways you can effectively help a child(ren) grow and heal from traumatic life experiences?

11. **Understanding the Foster Parent's Role as a Decision-maker -** The applicant's ability to understand and acknowledge their duty to make reasonable and prudent decisions that enhance development and support normalcy for children. This allows foster/pre-adoptive parents to appropriately and effectively discipline, to make important decisions, and to intervene on behalf of the foster/pre-adoptive child(ren).
   o Have you ever cared for someone else's child?  What challenges did you experience? How did you address those challenges?
   o Tell me about a time when you needed to make a decision that potentially might have had a favorable or an unfavorable outcome. What process did you use in your decision-making? Was it

an independent decision, or did you rely on outside assistance? Who? What pressures were you up against? What was the outcome?

12. **Ability and Willingness to Engage in Parenting -** The applicant's ability to model appropriate behaviors for the child and to use age and developmentally appropriate behavior management techniques. Parenting children with a history of trauma often requires close supervision, interactive instruction, modeling, redirection, and purposeful play to build attachments.
    o   How were you disciplined? What strategies did your parents use that you would consider effective? Ineffective? Appropriate? Inappropriate?
    o   Tell me about a time you have had to give a consequence to a child. What was it? What was the outcome? How did you feel about it?
    o   How do you determine which methods of discipline are age appropriate and child-specific?

13. **Ability to Make and Honor Commitments -** The applicant's ability to see the child as a family member. This category includes exploration of long-term identity issues common to foster/pre-adoptive children like birth family search and reunions, "leaving the nest," and expectations for future education, self-sufficiency, family connections, etc.
    o   Tell me about a time when you wanted to quit something that became very hard for you. What did you do? What was the outcome?
    o   Tell me about a time when a commitment to you was broken and how you dealt with those feelings.
    o   Is there anything someone could do you would consider unforgivable, a behavior that would end the relationship?
    o   Describe a time when you were unable to keep a promise/commitment. What was the circumstance and what was the outcome?  How did you feel about your decision?

14. **Cultural Humility -** The applicant's ability to acknowledge and respect the magnitude of diversity that exists, and their openness to diverse cultural needs and practices of foster children and their families.
    o   Tell me about your religious or spiritual beliefs, viewpoints, or practices. Are you currently affiliated with any particular religious or spiritual group? If so, please identify the group. How often do you congregate?
    o   What religious expectations or requirement do you have for children in your home? Describe any religious practices or beliefs you embrace. How will they influence your ability to care for children who come into care?
    o   Do you consider your current neighborhood and wider community affirming for a child(ren) from a diverse ethnic/cultural background?  Explain.
    o   What areas of your life do you suspect religion, sexual orientation, or gender identity might affect? Give examples.
    o   Describe your perspective on supporting a child's culture, including a child's religion, ethnicity, sexual orientation or gender identity/expression, while living in your home.

- o Describe how you would protect/prepare/defend a foster or adopted child from negative and/or unfair comments in a public setting such as a grocery store, church or park.
- o Similarly, how you would protect/defend a foster or adopted child from negative and/or unfair comments from within your personal circle such as other family member(s), friends, and neighbors?

15. **Understanding of Other Household Members -** The ability for each household member to understand the impact of becoming a foster/pre-adoptive family.

<u>For Children:</u>
- o Have your parent(s) talked to you about sharing your home with (an)other child(ren)?
- o How do you feel about having another child in the home? Do you have any hopes? Any worries? What will you share? What won't you share?
- o How do you get along with your siblings? What's the best thing about having siblings? What's the hardest thing?

<u>For Adults:</u>
- o How do you feel about the applicants' interest in fostering/adopting a child(ren)? What is your understanding of their motivation to foster/adopt?
- o What responsibilities and roles will you have with a new child(ren) in the home?
- o What worries/hopes do you have?

16. **Unique Considerations for Kinship Foster Parents -** The ability of kinship caregivers to understand their role as both caregiver and family member and their ability to meet the needs of the children.
- o How have you managed any tensions with the child(ren)'s parents or other family members in the past?
- o Who are the other family members, immediate or extended that you have as supports? Are there any family dynamics that you're worried about?
- o How much do you know about the child(ren)'s experiences, their needs, and how prepared do you feel to manage those needs? What challenges do you anticipate? What worries you?
- o If you have both biological and kinship foster children, how would you make them feel equally loved and wanted?
- o What supports do you anticipate you and your family will need from the Department?
- o How will you and your family prepare for and support the transition of a child(ren) out from your home when that time occurs?

17. **Unique Considerations for Parents Seeking to Adopt -** The ability of caregivers to understand and communicate their motivations to adopt and their experience and ability to parent.
- o Have adoption plans been discussed with family, friends, and neighbors? What are their reactions? How will their attitudes influence your ability to parent?

- o If you have both biological and adopted children, how would you make them feel equally loved and wanted?
- o What expectation(s) do you think a child has of their adoptive parents and family?
- o How and when do you plan to tell your child his/her adoption story?
- o How will you respond to your child's questions about the conditions of their parents that made them available for adoption?

18. **Safety and Clinical Concerns -** Any personal experience(s) or traumatic experiences of the parent/caregiver that may warrant additional inquiry and exploration by the LTSW including but not limited to:
- o Domestic violence or a pattern of unhealthy relationships (survivor/perpetrator);
- o Physical abuse and/or neglect (survivor/perpetrator);
- o Sexual abuse (survivor/perpetrator);
- o Substance use/misuse;
- o Rigid or inflexible beliefs;
- o Challenges with child-rearing;
- o History of physical or behavioral health challenges that may impact an applicant's ability to meet the needs of a child (e.g., acute/chronic illness); and
- o Unresolved grief and loss

19. **Background Records Checks (BRC) -** the applicant's understanding of the information found and reviewed in the background record check, including children welfare history, CORI and SORI results, that has bearing on their ability to provide a safe and stable home for a child(ren)
- o What was happening in your life at the time of the event(s)?
- o What, if any, treatment or rehabilitation did you participate in?
- o What changes did you make in your life as a result of the treatment or rehabilitation?
- o What impact do you think the [BRC findings] have on your parenting ability?
- o What lessons were learned from this event in your life?

20. **Family Income Analysis -** A family's financial health is critical to their ability to care for their own family/household without needing financial support from the Department. Applicants must have income and resources to make timely payments for shelter, food, utilities clothing, and other household expenses prior to the addition of a foster child(ren) in their home.
- o What is your family's total monthly household income?
- o What is/are the source(s) of your family's household income?
- o What are your total monthly expenses?
- o Are you able to make timely payments for shelter, food, utility costs and clothing?
- o Do you have any financial worries about providing for an additional child(ren) in your home? Please explain and provide detail about the concern(s) you have.

*[NOTE: Applicants with disabilities must be assessed on an individualized basis and determinations regarding their parental capacity must be based on objective facts and not on stereotypes or generalizations about individuals with disabilities. Additionally, such determinations must take into account the applicant's existing supports, as well as any disability related accommodations or services the Department could provide to ensure the applicant can fully and equally participate in the Department's foster care program.]*

## WRITING THE CAREGIVER ASSESSMENT

The Caregiver Assessment includes all information gathered throughout the foster/pre-adoptive family's association with the Department. This includes but is not limited to:

- observations from the Recruiter;
- the family's Application;
- results from criminal and child welfare history checks and associated documentation;
- interviews with the family;
- interviews with non-household members;
- interviews with references and associated documentation; and
- training materials (observations of the family in training, Training Log, and Training Evaluation); and
- the foster parent/family's preferences in the type of child they are interested in fostering/any special caregiving abilities.

The LTSW uses all of this information along with their critical thinking and clinical experience to write the following items:

**Clinical Formulation -** The LTSW evaluates the applicant's knowledge and use of the protective factors in caregiving. The clinical formulation summarizes the applicant's capability and readiness to foster or adopt a child.  This includes their ability to work as a team member with the Department as a licensed home and their strengths and areas of challenge.

**Training and Support Plan -** The LTSW and the family discuss what resources and supports the family will need in order to have successful placements. Together, they create a training and support plan which lists community or other resources the family will access and the ways in which the Department commits to helping the family. It also addresses how the family will further develop their knowledge and skills. The family is encouraged to identify, request and participate in specific trainings that will increase their understanding and skills as a caregiver.

**Recommendation -** The LTSW recommends to license or not to license the home. If the recommendation is to license, the LTSW determines the physical capacity of the foster home and makes a recommendation for first placement. Placement recommendations take into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster and the capacities of the foster parent.  The LTSW seeks input from their supervisor and APM as needed.

## II. COMPLETING THE ANNUAL ASSESSMENT

The annual assessment is a comprehensive review of the family's previous 12-month history as caregivers for a child(ren). It provides the Department with the opportunity to meet with the foster parents to talk about the previous year, including any significant events or changes that may have impacted their caregiving ability. Together the LTSW and the foster parents revisit applicable caregiver assessment discussion topics to examine differences in the foster parents' attitudes, beliefs, skills, and strategies. They review placements in the last year and the related successes and challenges and seek examples of situations/events that demonstrate the family's caregiving abilities. They examine the foster parent(s)'s

continued ability and willingness to meet the needs of the foster child(ren) and whether there are any changes to the foster family's preference for type(s) of foster children or special caregiving abilities.

During the annual assessment the following information is gathered for review. The LTSW uses all of this information along with their critical thinking and clinical experience to write the annual update of the Caregiver Assessment.

- Results from criminal and child welfare history checks and associated documentation
- Visit(s) to the home for evaluation of continued compliance with physical standards and interviews with the foster family household members,
- Interviews with references and associated documentation,
- Review of last annual/interim assessment (if applicable)
- Participation in trainings

The following sample questions are a guide for exploring the previous year. Any contradiction(s) in statements, and/or responses from question to question, will indicate an area that should be explored further with the family.  It is important for the family to be able to describe challenging experiences and well as successful ones. The LTSW should get a comprehensive, clear and consistent picture of what types of experiences the child(ren) and the family have had in the previous 12-month period to use in order to develop a clinical formulation and complete the annual update of the Caregiver Assessment.

- Describe some of your most successful/positive experiences over the past year with the child(ren) placed in your home.
- What have been some of the normal childhood activities you provided for the child(ren) in your home? How did you decide on the type(s) of activities and what was the outcome?
- Describe opportunities you have had in working directly with children's parents/families and their extended relatives. What strategies have you found most helpful in engaging biological parents/families, and what strategies have been the least helpful?
- Describe your experience(s) with teaming with the Department - including your FFSW, the child(ren)'s SW and other foster parents and the impact it has had on your caregiving understanding and overall experience.
- Were there any situations which you felt were difficult to deal with (e.g., child's behavior, emotional disposition)? If yes:
    - o   Who was involved in the situation?
    - o   Who did you think was the most helpful/supportive to the child(ren)/you/your family?
- What trainings have you attended this past year?
    - o   Which trainings were the most helpful?
    - o   Which trainings were the least helpful?
    - o   What are your suggestions for additional training topics?
- Do you participate in activities provided by DCF (such as meetings organized by your Area Office, Wonderfund, support groups)?
- Have you requested or utilized services for the child(ren) placed in your home?
- Are there services or supports you feel you have needed, but were unable to obtain?
- Are you participating in another role within DCF like MAPP Trainer; promoting trainings; facilitating support groups; and if not, would you be interested?

**WRITING THE ANNUAL ASSESSMENT**

**Clinical Formulation -** The LTSW evaluates the applicant's knowledge and use of the protective factors in caregiving. The clinical formulation summarizes the applicant's continued capability to foster or adopt a child.  This includes their ability to work as a team member with the Department as a licensed home and the family's strengths and areas of challenge.

**Training and Support Plan -** The LTSW and the family discuss what resources and supports the family will need in order to have successful placements. Together, they update the training and support plan which lists community or other resources the family will access and the ways in which the Department commits to helping the family. It also addresses how the family will further develop their knowledge and skills. The family is also encouraged to identify, request and participate in specific trainings that will increase their understanding and skills as a caregiver.

**Recommendation -** The LTSW recommends whether or not to continue to license the home. If the recommendation is to continue the license, the LTSW may revise the recommendation for the physical capacity of the foster/pre-adoptive home and the type of children placed in the home.  Placement recommendations take into account any wishes of the foster/pre-adoptive parents about the type of child they want to foster or adopt and their parental capacities. The LTSW seeks input from their supervisor and APM as needed.

**III.  COMPLETING THE INTERIM ASSESSMENT**

An Interim Assessment occurs when there is an allegation of abuse or neglect filed against any foster family household member or when an issue/incident arises that impacts the safety and well-being of the child(ren). The following sample questions are a guide in interviewing the family to explore the allegation/incident. The primary focus of the interim assessment is to gain an understanding of the underlying issue(s) leading up to and prompting the need for an interim evaluation of the family.  The interim assessment provides an opportunity for the LTSW and the family to identify the family's areas of challenge and develop specific interventions for additional training and support to improve placement stability). Additionally, the interim assessment gives the family a chance to discuss and voice their thoughts and feelings about the allegation/incident that prompted the interim evaluation. The LTSW should get a comprehensive, clear and consistent picture of the incident in order to:
1)   re-evaluate the family's understanding of and use of the protective factors;
2)   identify the family's specific training need related to use of the protective factors; and
3)   develop a clinical formulation and update of the caregiver assessment.

During the interim assessment the following information is gathered for review. The LTSW uses all of this information along with their critical thinking and clinical experience to write the interim update of the Caregiver Assessment.
- Results from criminal and child welfare history checks and associated documentation
- Visit(s) to the home for evaluation of continued compliance with physical standards and interviews with the foster family household members,
- Interviews with references and associated documentation,
- Review of last annual/interim assessment (if applicable)
- Participation in trainings

The following sample questions are a guide in interviewing the family and exploring the allegation/incident.
- When and where did it happen (date and location)?

- o Who was involved/present during the occurrence - other household member (relative not living in the home/non-relative not living in the home)?
- o Was anyone physically injured during the incident?
- o What were the circumstances leading up to the incident?
- o What discussion took place after the incident and who was involved in the discussion?
- o How did the incident impact the child?
- o Who/what resource(s) did you seek assistance and support from during this period?
- o What corrective plans have been created to prevent the incident from occurring again or to avoid a similar incident?
- o What was your response to the incident?
- o How did your expectations inform your response to the incident?
- o What are your feelings and insights about the allegation and subsequent investigation?  How will that process impact your/your family's ability to work with the Department moving forward?
- o What have been the most challenging experiences as a foster/pre-adoptive parent/family?
- o Describe a situation that has been challenging for you/your family during this period of providing care for the child(ren) in your home, and how you addressed it.
- o During a period of challenge, to whom did you reach out for advice and support?
- o During a period of challenge, did you reach out to the Department to discuss the circumstance and to get needed support?
- o What has been most rewarding about your family's foster/pre-adoptive caregiving experience?

## WRITING THE INTERIM ASSESSMENT

**Clinical Formulation -** The LTSW evaluates the applicant's knowledge and use of the protective factors in caregiving. The clinical formulation summarizes the applicant's continued capability to foster or adopt a child.  This includes their ability to work as a team member with the Department as a licensed home and the family's strengths and areas of challenge.

**Training and Support Plan -** The LTSW and the family discuss what additional resources and supports the family will need in order to stabilize the placement. Together, they update the training and support plan which lists community or other resources the family will access and the ways in which the Department commits to helping the family. It also addresses how the family will further develop their knowledge and skills. The family is also encouraged to identify, request and participate in specific trainings that will increase their understanding and skills as a caregiver.

**Recommendation -** The LTSW recommends whether or not to continue the license. If the report of abuse or neglect is supported, the home will be closed to future placements. If the recommendation is to continue the license, the LTSW may also recommend a change in the recommended placements, which should also take into account any wishes of the foster parent(s) about the type of child they want to foster. The LTSW seeks input from their supervisor and APM as needed.

## IV. COMPLETING THE PERMANENCY ASSESSMENT

A permanency assessment occurs after a disclosure meeting when a foster family decides they want to adopt a child who is currently living in their home. The permanency assessment addresses how the foster family can meet the specific needs that the child has for safety, permanency, and well-being. It evaluates their readiness to adopt and helps to identify any ongoing needs of the family. The assessment also explores the family's history of fostering the child from their initial placement through to current functioning – including significant events (successes/ challenges) that demonstrate the family's long-term caregiving capacity.

The information gathered is integrated into the development of a clinical formulation and used to complete a written recommendation about the suitability of the foster family as a permanent legal family for the child. The specific focus areas of the assessment include:
- Family's Current Functioning (progress & challenges)
- Parents' Knowledge and Use of Protective Factors
- Motivation to Adopt
- Family's Financial Readiness

During the assessment, the LTSW talks with the FFSW, child's Adoption Worker, past Social Workers as needed, the caregiver(s) and the child; compiles and reviews information from previously completed assessments; and includes information about the child's current academic, behavioral and medical heath status to write a comprehensive pre-adoption assessment. The LTSW should get a clear and consistent picture of the relationship between the caregiver and the child and should develop an understanding of the caregiver's ability to parent successfully and meet the specific needs of the child.

The following questions are a guide for exploring the topic areas with the potential pre-adoptive caregivers/family. When the child has been living in the foster family home, the questions should be tailored to reflect the foster family's experiences in parenting the child.

The following are sample questions used to explore and guide the conversation with the child and caregiver(s) about their relationship and experiences together.

**The Family's Relationship with the Child**
- Tell me about the child/ren you are planning to adopt?
- Describe your relationship with the child/ren.
- Describe your understanding of the child/ren including:
  - their needs
  - their behaviors
  - their likes and dislikes
- Describe the relationship the child/ren have with the other household members including the adults and other child/ren (if applicable).
- How has your parenting of the child change over time as the child has developed?
- What do you most enjoy about parenting at the child/ren's current stage of development?
- What about parenting the child/ren at this stage is most challenging for you?
- Describe your current parenting strategies and practice with setting healthy and age-appropriate boundaries for the child.
- How do you model healthy communication and relationships for the child?
- What strategies do you use to manage normal everyday stressors including the stressors associated with parenting?
- What new insight(s) have you gained about the child/ren's behavior(s) based on their past adverse experiences, and how do you plan to work through those periods to help the child/ren process, heal and move forward from those traumatic experiences?
- During challenging and difficult parenting periods, who do you seek out for advice and support (friend/family network), and do you anticipate continued support from those currently in your friend/community network?
- Is there a current issue with or concern about the child/ren including any of their behaviors and/or special needs that would make you reconsider your adoption decision?
- Has there been a time in your current parenting experience that you needed to forgive the child/ren's behavior/actions (e.g., a verbal insult, destruction of property)?  If yes, please describe the situation and the child/ren's response.
- Has there been a time in your parenting experience with the child/ren when you needed to apologize and/or ask the child/ren for forgiveness?  If yes, please describe the situation and the child/ren's response.
- Is there anything that the child/ren could do that you would consider unforgivable and/or a behavior that would change/jeopardize your relationship with the child/ren?

- What level of support do you currently have from your household members (including other child/ren) and other extended family about your decision to adopt, and do you anticipate any change in the current support you have from household/family members about your decision to adopt?

**Family's Understanding of and Capacity to Meet the Child's Needs**
- Describe how you have navigated meeting the child/ren's specific behavioral, educational, and medical needs.
- How will your parenting style and strategies change as the child grows and moves through stages of development (e.g., adolescence/young adulthood)?
- What are the child/ren's identified services that you will need in the immediate future to parent successfully?
- What are the child/ren's identified long-term service needs and how do you plan to you to meet those identified needs in the future?
- What are you most looking forward to as you think about the child/ren's ongoing growth and development?
- What challenges do you anticipate having as the child/ren transition(s) through developmental stages (e.g., adolescence/young adulthood)?
- Are you and your household prepared to independently provide for the financial and material resources needed to continue to care for the child/ren you are adopting?
- Have you created a budget plan for meeting the child/ren's daily/routine and ongoing needs without financial support from the Department?
- What financial concerns do you have for the immediate future about providing for the child/ren's routine needs (including health, medical, dental, educational expenses and/or special need expenses)?
- What financial concerns do you have about providing for the long-term needs of the child/ren you are adopting (including health, medical, dental, educational and/or special need expenses)?
- Have you developed a financial plan for meeting the child/ren's ongoing special needs (if applicable)?

**Family's Capacity to Work with the Child's Birth Family and Honor the Child's Background (this includes their long-term plan to meet this need in the future)**
- Describe your ability to meet the child/ren's needs in maintaining connection to their family and community of origin.
- Describe your family's relationship with the child/ren's birth parent(s)/family including (as applicable):
    o how have you experienced and felt about family time/visits with the child/ren's birth parent(s)/family?
    o how have members of your household experienced and felt about family time/visits with the child/ren's birth parent(s)/family?
    o what is your understanding of why maintaining the birth family's connection for the child/ren is important?
    o what is your willingness and ability to maintain connection with the child/ren's birth parents, siblings, and extended family?
    o does your family have an interest in pursuing an open adoption – if yes, what degree and frequency of contact will the birth parent(s)/family have with the child/ren?
    o what is your/family's willingness to engage in permanency mediation with the child/ren's birth family?
- How do you and your household plan to maintain the child/ren's connection to their family and community of origin, and integrate those important elements into the child/ren's normal experiences?

*For transracial adoptions and caregivers adopting a child of a different cultural/ethnic/linguistic background than their own:*
- Describe your/family's comfort and competence in parenting the child in your care who is from a different racial or ethnic background.

---

- How have you and your household acknowledged, honored and integrated the child/ren's culture of origin [racial, ethnic, linguistic, and religious background] into the child/ren's and your family's life?
- How do you plan to continue to acknowledge, honor and integrate the child/ren's culture of origin into the child/ren's and your family's life?
- Have you had to protect and/or defend the child/ren from negative, unfair and/or harmful comments in a public setting such as a grocery store/church/park?
    o Describe the circumstance and your response.
    o How did you explain the situation to the child/ren?
    o What was the child/ren's response/reaction?

**The Child/ren** (*use as age/developmentally appropriate*):
- Tell me about the parent(s) and family who are adopting you?
- What are you most excited about living in the home (OR as you move into the home)?
- How do you feel about living with the other members of the family including the other child/ren?
- What is your favorite thing about living with the parents and family who are adopting?
- What are your concerns/fears about living with the parents/family who are adopting you?
- Describe the other child/ren in the home and your relationship with them.
- Who do you look for and/talk with when:
    o you are angry?
    o you are sad?
    o you are happy?
    o confused or scared?
- How would you like to stay connected to your siblings and other bio-family members?
- What are the traditions celebrated by your bio-family would you like to continue to celebrate?

*For transracial adoptions and a child/ren being adopted into a family of a different cultural/ethnic/linguistic background than their own* (**use as age/developmentally appropriate**)*:*
- What are some of your favorite things about your bio-family's traditions and culture practices (e.g., foods/meals, holidays)?
- How would you like to stay connected to the traditions practiced and celebrated by your bio-family?
- What ideas about staying connected to your community and culture would you like your adopted parents and family to know and plan to continue to practice/celebrate (e.g., cooking certain foods/meals; attending religious services; learning your language/conversational phrases)?

## WRITING THE PERMANENCY ASSESSMENT
**Clinical Formulation** – The LTSW evaluates the pre-adoptive parents' knowledge and use of the protective factors in caregiving. The clinical formulation summarizes the pre-adoptive caregiver's ability to meet the specific safety, permanency and well-being needs of the child(ren) and their capability to parent the child(ren) and integrate them into their family. All of the information gathered is used to determine the family's capacity to provide permanent care for the child.

**Training and Support Plan** – The LTSW and the family discuss what resources and supports the family will need in order to successfully integrate the child into their family. Together, they update the training and support plan which lists community or other resources the family will access and the ways the in which the Department commits to helping the family. It also addresses how the family will further develop their knowledge and skills. The family is also encouraged to identify, request and participate in specific trainings that will increase their understanding and skills as a caregiver.

**Recommendation** – The LTSW recommends whether the foster family should become the pre-adoptive family for the child.

**APPENDIX B. HOUSING STANDARDS FOR FOSTER/PRE-ADOPTIVE HOMES**

| | |
|---|---|
| **SAFETY** | 1) The home must be clean; free from rodent and/or insect infestation; safe; free of obvious fire and other hazards, inside or outside the home; |
| | 2) The home shall establish conditions that prevent a child's access, as appropriate to the age and development of any child residing in the home, to all potentially hazardous materials, including, but not limited to, medications, poisonous materials, cleaning supplies, and/or alcohol beverages or marijuana. |
| | 3) Each home shall have an emergency preparedness plan and |
| |     (a) have a written emergency evacuation plan to be reviewed with any foster child, as appropriate to the age of the child, which shall be posted in a prominent place in the home; |
| |     (b) maintain a comprehensive list of emergency telephone numbers, including poison control, which shall be posted in a prominent place in the home; |
| |     (c) Maintain first aid supplies |
| | 4) Each home must ensure compliance with the following fire safety and emergency planning requirements: |
| |     (a) Each floor of the home and near each sleeping area, including the basement, shall be equipped with at least one smoke detector and at least one carbon monoxide detector in working order; |
| |     (b) Have at least one operable fire extinguisher that is readily accessible; |
| |     (c) Be free of obvious fire hazards. Such as defective heating equipment or improperly stored flammable materials; |
| **TOTAL CHILDREN IN HOME** | 1) The home must be of sufficient size to accommodate comfortably and appropriately all members of the household and the approved number of foster/pre-adoptive children. |
| | 2) No more than six foster children, shall reside in the foster/pre-adoptive home at any one time. |
| | 3) The Department may place additional foster children in the foster home to allow: |
| |     (a) To allow a parenting youth in foster care to remain with the child of the parenting youth; |
| |     (b) To allow siblings to remain together; |
| |     (c) To allow a child with an established meaningful relationship with the family to be placed or remain with the family; or |
| |     (d) To allow a family with special training or skills to provide care to a child who has a severe disability |
| **SLEEPING** | 1) The home must have sufficient furniture to allow each child to sleep in a separate bed and to have adequate storage space for his or her |

|  |  |
|---|---|
|  | personal belongings. |
|  | 2) Foster parents shall not co-sleep or bed share with infants at any time. |
|  | 3) The home must have bedrooms which provide at least 50 square feet per child, unless determined in the best interest of the child, on a case-by-basis, for kinship placements and approved by the Department of Early Education and Care. |
|  | 4) No more than four children may share a bedroom. |
|  | 5) No foster child over one year of age shall share a bedroom with an adult, except (a) if the foster children have been sharing a bedroom in the foster home prior to their 18th birthday and one of the children turns 18 years of age; or (b) in kinship homes after the Department has determined that such a sleeping arrangement is appropriate and in the best interests of the child. |
|  | 6) No bedroom to be used by foster children shall be located above the second floor of a house unless any such floor has residential structures and means of exit according to state law/housing code. |
|  | 7) No bedroom to be used by foster children shall be located below the first floor unless it contains a ground level, standard door exit, and at least one operable window. |
| **UTILITIES, KITCHEN and BATH** | 1) The home must have safe and adequate lighting, ventilation, electricity, and heat. |
|  | 2) The home must have hot and cold running water. |
|  | 3) The home must have a properly operating bathroom with a sink, toilet, tub and/or shower. |
|  | 4) The home must have a properly operating kitchen with a sink, refrigerator and stove and oven. |
|  | 5) The home must be equipped with a telephone in working order for both incoming and outgoing calls while the foster child is in the home or establish an alternative plan to access a working phone in close walking proximity. |
|  | 6) If the home uses well water, it shall be tested and determined safe, in accordance with the policies and procedures established by the local board of public health wherein the foster parent(s) resides. |
| **FIREARMS** | 1) Any firearm located in the home shall be licensed and registered in accordance with state law and shall be trigger-locked or fully inoperable, and stored without ammunition in a locked area. Ammunition shall be stored in a separate locked area. Other weapons should be stored in a locked area. All storage areas shall be inaccessible to children. |
| **PETS and ANIMALS** | 1) Any pet/animal maintained on the premises of the foster/pre-adoptive home must be appropriate and safe for the children in care, as determined on a case-by-case basis, have up to date vaccinations and be licensed in accordance with the municipality in which the pet/animal is maintained. |

|  | *[**NOTE**: children under the age of 12 will not be permitted to be placed in a home with a Rottweiler, Pit Bull or German Shepard dog, or a dog which mixes 2 of the 3 breeds, unless it is determined to be in the best interest of the child, or unless the dog is a certified assistance animal for a member of the household.]* |
|---|---|
| **POOLS, HOT TUBS, SPAS** | 1) For homes equipped with swimming pools, hot tubs or spas, the foster parent must provide documentation that the swimming pool or hot tub meets all state, tribal and/or local safety requirements. |
| **SMOKING** | 1) Foster parents, their household members and guests will not be permitted to smoke or use electronic cigarettes in the foster home, in any vehicle used to transport a foster child or in the presence of the foster child. |

## APPENDIX C. LICENSING OF DEPARTMENT AND PROVIDER EMPLOYEES

### A. POLICY

The Department supports its employees and providers' employees who want to be licensed as a Department foster/pre-adoptive family for children who are in its care or custody by establishing procedures regarding:

- the Department/provider employee's request to seek licensing,
- the Decision to approve or deny the application for licensing and the license, and
- the decision to place a specific child who is in Department care or custody in a Department employee/provider's licensed foster/pre-adoptive home.

The Department must ensure that all employees comply with the conflict-of-interest law when they become a foster/pre-adoptive parent for the Department. The Department must also ensure that the decision to license or not license an employee's home or the decision to place a child in their home is done in an objective, unbiased manner that does not give the employee any preference over another foster/pre-adoptive family.

To promote licensing of employees in a manner that is objective and consistent with the Department's standards, the Department refers employees for completion of the Application Review and/or the Caregiver Assessment to:

- a private agency under contract for this purpose,
- an Area Office different from the Area Office in which the employee works if the employee is seeking an Immediate Kinship Placement, or
- a Regional Office in a different Region if the employee is seeking to be an unrelated foster/pre-adoptive home.

For an employee working in the Department's Central Office who is seeking licensing as a Department foster/pre-adoptive parent, the Central Office review team determines where the employee should be referred for completion of the Application Review and/or the Caregiver Assessment.

If a Department employee wishes to provide foster care for another agency which has a contract to provide foster care for Department involved children, or if a Department employee who is licensed by another adoption agency seeks to have a child in Department care or custody placed in their home, they must receive the approval of the Central Office Team.

## II.   PROCEDURES

## B.   DEFINITIONS/KEY TERMS

**Employee:** For the purpose of this policy, employee refers to either a Department employee or an employee of a Department contracted provider.

**Employee Manager:**  For the purpose of this policy, the Employee Manager refers to the manager where the employee works and includes the Area Director for Area Staff, the Executive Director/designee for Provider agency staff, the Regional Director for non-legal regional Office staff, the Regional Counsel/designee for regional legal staff, the General Counsel for Central Office legal staff, and the Central Office Manager for Central Office staff.

## C.   PROCEDURES: EMPLOYEE LICENSED AS DEPARTMENT FOSTER/PRE-ADOPTIVE PARENT

The Department seeks to support placement while also ensuring that a child who is in Department care or custody is not placed with an employee who works in or closely with the office that has case assignment responsibility for the child or the child's family.

All employee requests to become licensed as a Department foster/pre-adoptive family and the decisions regarding such licensing and placement of children with them are subject to review and approval by a Central Office review team. The team consists of the General Counsel and Assistant Commissioner for foster care and adoption or their designees.

The Department enacts measures to preserve confidentiality regarding the Employee's family life throughout the Application Review and Caregiver Assessment process and afterwards if they become a foster/pre-adoptive parent for a child who is in Department care or custody. Employees seeking to become Department foster/pre-adoptive parents must preserve the confidentiality rights of any child who might be placed with them and their family. ***Employees are not allowed to examine Department records for a child or the child's family except as required by their official duties.***

| | |
|---|---|
| **Request to Become Unrelated or Kinship Foster/Pre-Adoptive Parent.** | 34. The employee submits a written request, on a form approved by the Department, to their Manager specifying the type of licensing they are seeking. |
| | 35. The Manager sends the request to the Regional Director and to the Employee Liaison at Central Office, indicating whether or not they support the request. |
| | 36. The Employee Liaison will contact the employee within five working days to obtain additional information, if necessary, and to explain the application review and caregiver assessment and approval process. |
| | 37. The Employee Liaison will notify the Deputy Commissioner/designee of the request and forward the request to the General Counsel for initial conflict review and approval. |
| **Initial Review** | 38. The General Counsel/designee will review the request to determine if any conflict exists. The General Counsel/designee will notify the Employee Liaison of the approval/disapproval of the request. If the request is not approved, the employee may request a review of the decision through the Department's grievance process. The grievance will be conducted by the Assistant Commissioner over foster care and the General Counsel. |
| | 39. Within 10 working days after the date the request was received, the Employee Liaison will notify the employee/provider, in writing, of the outcome of the request review. If the request is approved, the Employee Liaison will refer the request to a regional office or contract agency, within 14 working days, to complete an Application Review and, if viable, a Caregiver Assessment, and inform the employee/provider of the Regional Office/Agency that will be completing the Caregiver Assessment. |

| | |
|---|---|
| **Application Review and Caregiver Assessment** | 40. Once completed, the Caregiver Assessment and related recommendation(s) is forwarded to the Employee Liaison, who notifies the Deputy Commissioner and submits the Caregiver Assessment to the General Counsel/designee and Assistant Commissioner/designee for approval. The employee/provider seeking licensure will be notified of the outcome within 14 working days. |
| **Review Outcome Notification** | 41. The Employee Liaison will notify the Office and the employee of the outcome of the Central Office review immediately upon receipt of such determination by the General Counsel/designee and the Assistant Commissioner/designee. |
| | 42. If the employee request is approved, the notification will include any limitations on the placements in the home based on where the Employee works and any other significant factors.  If the employee request for licensure is denied, the employee will have the right to appeal the decision through the Department's Fair Hearing process, pursuant to 110 CMR 10.00. |
| | 43. Prior to any placement with a Department employee, the Department employee **MUST** file a disclosure of financial interest ethics form with the State Ethics Commission and provide a copy to the Employee Liaison. The child may not be placed until the form has been filed and a copy provided to the Central Office Employee Liaison. |
| **Post-Placement Case Assignment Responsibility** | 44. The Employee Liaison, in consultation with the Area Director of the child's case will assign on-going responsibility for the child to the appropriate Area Office, if needed. |
| **License Approval** | 45. All state employees are required to file an ethics form with the State Ethics Commission as part of the Caregiver Assessment process.  No license will issue until a copy of the ethics form that was filed with the Commission is provided to the Central Office Employee Liaison. |
| **Immediate Placement** | 46. When an employee is identified as a possible Kinship placement for an immediate placement of a child who is in Department care or custody, the Social Worker submits a request, in writing, to the placing Area Director/designee for approval to place the specific child with the employee. |
| | 47. The Area Director/designee notifies the Regional Director of the request and forwards the request to the Area Director/designee of the Area Office or the Executive Director/designee of the agency that will be conducting the Immediate Kinship Placement activities. If Immediate Kinship Placement is approved, Area Director/designee notifies Regional Director that a Caregiver Assessment is needed. |
| | 48. The assigned KSW conducts the activities to permit an immediate kinship placement. If the home is viable for immediate kinship placement, the Employee Liaison is notified who obtains review by the Central Office Team. If the immediate kinship placement is not viable, the Area Director/designee of the office that made the decision notifies the placing Area director/designee, and the matter is either closed or proceeds as a request for an application review and caregiver assessment as described above. |

**D. PROCEDURES: EMPLOYEE PROVIDING FOSTER CARE FOR A FOSTER CARE AGENCY UNDER CONTRACT WITH DCF**

Department or provider employees seeking to provide foster care for another foster care or adoption agency which has a contract with DCF to provide placement for children in DCF care or custody must request approval in writing from the Department Central Office team prior to applying to the agency.

| | |
|---|---|
| **Employee Requests Approval to Provide Foster Care for Another Agency** | 49. Before applying to another agency, the Department employee submits a written request, on a Form approved by the Department, to the Manager in the office where the employee works, stating: <br><br> o the name and address of the agency for which the Department employee is seeking to provide foster care; <br><br> o the reason(s) why they would like to provide foster care for the other agency; and <br><br> o if applicable, the name of the specific child they would like to have placed with them if known, and a brief description of how they are related to or acquainted with the child. |
| **Review of Request and Outcome Notification** | 50. The Employee's Manager sends notification of the request to the Regional Director and the Employee Liaison at Central Office. The Employee Liaison will then notify the Deputy Commissioner/designee of the request and forward the request to the General Counsel. |
| | 51. The General Counsel/designee will review the request to determine if any conflict exists. The General Counsel/designee will notify the Employee Liaison of the approval/disapproval of the request. If the request is not approved, the employee may request a review of the decision through the Department's grievance process. The grievance will be conducted by the Assistant Commissioner over foster care and the General Counsel. |
| | 52. Within 10 working days after the date the request was received, the Employee Liaison will notify the employee, in writing, of the outcome of the placement request review. |

**E. PROCEDURES: EMPLOYEE LICENSED AS PRE-ADOPITVE PARENT REQUESTS PLACEMENT OF DEPARTMENT INVOLVED CHILD**

Employees do not need Department approval to apply to become licensed to adopt a child from a private, licensed placement agency. However, Department approval will be required if the child the employee seeks to adopt is a child in Department care or custody, regardless of who licensed the employee's pre-adoptive home.

| | |
|---|---|
| **Employee Requests Approval for a Placement of Child in Department Care or Custody** | 53. When an employee is identified as a possible pre-adoptive placement for a child who is in Department care or custody, the child's Social Worker submits a request, in writing, to the placing Area Director/designee for approval to conduct the formal disclosure meeting and place the specific child with the employee. |
| | 54. The Area Director/designee notifies the Regional Director of the request and forwards the request to the Employee Liaison. The request includes how the employee was identified as the best match for this child, what other families were considered, why the employee was chosen, and any other information that would assist the Central Office team in understanding the match. |
| | 55. The Employee Liaison will notify the Deputy Commissioner/designee of the request and forward the request to the General Counsel/designee and Assistant Commissioner/designee for review and approval. |

**Review of Request and Outcome Notification**

56. The General Counsel/designee and Assistant Commissioner/designee will review the request to determine if any conflict exists. The General Counsel/designee will notify the Employee Liaison of the approval/disapproval of the request. If the request is not approved, the employee may request a review of the decision through the Department's grievance process. The grievance will be conducted by the Assistant Commissioner over foster care and the General Counsel.

57. Within 10 working days after the date the request was received, the Employee Liaison will notify the placing Area Director, in writing, of the outcome of the placement request review.

## F. PROCEDURES: EMPLOYEE AS A VISITING RESOURCE

**Employee Requests to be a Visiting Resource**

58. When an employee would like to continue or establish a relationship with a child who is in Department care or custody as a visiting resource, rather than a placement, the employee submits a written request to their Manager. The request specifies:
    - the name of the child with whom they would like to maintain or establish a continuing relationship outside the workplace,
    - the child's date of birth (if known),
    - a brief description of how they have become acquainted with the child,
    - the area office and/or social worker assigned to the child and child's family,
    - a brief description of the nature, frequency and location of all contacts that have occurred between the child and the employee up to the date of the request, if any, and
    - a brief description of the nature, frequency and location of the contacts they would like to have in the future with the child.

**Review of Request and Outcome Notification**

59. The employee's Manager/designee sends notification of the request to the Area Director and Regional Director where the child's case is assigned and the Employee Liaison at Central Office. The Employee Liaison will then notify the Deputy Commissioner/designee of the request and forward the request to the General Counsel.

60. The General Counsel/designee will review the request to determine if any conflict exists. The General Counsel/designee will notify the Employee Liaison of the approval/disapproval of the request. If the request is not approved, the employee may request a review of the decision through the Department's grievance process.  The grievance will be conducted by the Assistant Commissioner over foster care and the General Counsel.

61. Within 10 working days after the date the request was received, the Employee Liaison will notify the employee and the Area Director where the child is assigned, in writing, of the outcome of the visiting resource request review.

**Post-Approval Case Assignment Responsibility for Visiting Resource Assessment**

62. The Employee Liaison, in consultation with the Area Director of the child's case will assign responsibility to the appropriate Area Office or contracted agency for an applicable visiting resource assessment consistent with the Department's policy on approval of visiting resources.